**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| ANDREW ANDERSON, JOSHUA BURDI, ANDREW CARMICAL, ASHLEY COOK, ETHAN CORRIERE, MICHELLE GRISSOM, JOHNATHAN HODNEFIELD, ERICA HOLLAND, CATARINA LY, DAVID OTTENWELLER, SHANNON PELKIE-THERIAULT, CHRISTI SPRINGER, WILLIAM STELLMON, AND ELEAZAR ZWILLINGER, individually and on behalf all others similarly situated, | No. 2:25-cv-00050-JHC |
| | **THIRD AMENDED CLASS ACTION COMPLAINT** |
| Plaintiffs, | **JURY DEMAND** |
| v. | |
| AMAZON SERVICES.COM LLC, | |
| Defendant. | |

Plaintiffs Andrew Anderson, Joshua Burdi, Andrew Carmical, Ethan Corriere, Michelle Grissom, Johnathan Hodnefield, Erica Holland, Catarina Ly, Shannon Pelkie-Theriault, Christi Springer, William Stellmon, and Eleazar Zwillinger (collectively as "Plaintiffs") bring this action, on behalf of themselves and all others similarly situated ("Class Members"), against Defendant Amazon Services.com LLC ("Amazon" or "Defendant"). Plaintiffs seek to obtain their own monetary damages, restitution and reinstatement for their employment, and declaratory and injunctive relief, and any other form of relief under the law, for a class of individuals ("Class"

THIRD AMENDED COMPLAINT - 1
2:25-cv-00050-JHC

or "Class Members") who are similarly situated and who have illegally been denied reasonable accommodations at Amazon, and/or who have been constructively or actually terminated for seeking to use reasonable accommodations. **Pursuant to the Parties' stipulation (Dkt. 53, 57, 58), Plaintiffs Cook and Ottenweller assert the same claims solely in their individual capacities, and not on behalf of any other individuals.**

Plaintiffs make the following allegations upon information and belief, except as to their own actions, their own experiences, the investigation by their counsel, and the facts that are a matter of public record.

## I.  NATURE OF THE ACTION

1.  This case is about Amazon's centralized corporate policies that result in systematic disability discrimination and a deliberate failure to accommodate employees, a story representative of tens of thousands of current and former employees of Amazon.

2.  Amazon knows that its policies unfairly harm disabled employees but nevertheless demands strict adherence to, and continues the enforcement of, its discriminatory policies to protect its bottom line and reinforce its rigid, antiquated, and robotic corporate mandates related to reasonable accommodations.

3.  Amazon is required to comply with the Americans with Disabilities Act ("ADA") and must offer reasonable accommodations unless it would result in an undue hardship. The bar for showing that a reasonable accommodation would be an undue hardship is very high as an "[u]ndue hardship refers not only to financial difficulty, but to reasonable accommodations that are unduly extensive, substantial, or disruptive, or those that would fundamentally alter the nature or operation of the business." Enforcement Guidance: Reasonable accommodation & Undue Hardship Under the Americans with Disabilities Act No. 915.002, 2002 WL 31994335, at *4 (Oct. 17, 2002).

4.  Upon information and belief, Amazon reviews approximately 255,000 reasonable accommodation cases per year.

5.  Upon information and belief, Amazon relies on Artificial Intelligence ("AI") to

HARMAN GREEN
824 Exposition Ave., Suite 8
Dallas, Texas 75226

read, review, and respond to reasonable accommodation requests.

6. As well, Amazon relies on 'case managers': individual employees who read, review, and respond to reasonable accommodation requests. These case managers are routinely changed and do not dialogue meaningfully with any employee about their reasonable accommodation requests. Case managers are neither regionalized nor localized but rather work out of a remote location and operate on a nationalized basis. Stated differently, localized managers almost certainly will never meet the case managers who work on the Plaintiffs cases. More importantly, case managers possess zero independent decision-making authority and must strictly adhere to Amazon's illegal policies.

7. Each Plaintiff is a disabled employee. Their disabilities, however, do not impede their ability to work.

8. Stated differently, Plaintiffs are able to satisfactorily perform their essential job functions with or without accommodations.

9. Rather than provide accommodations or continue to accommodate employees who had previously been accommodated, Defendant has simply pushed each Plaintiff through a maze of red tape, all while failing or refusing to accommodate them. In fact, Defendant has blatantly refused their legal duties by terminating those who could only work with reasonable accommodations.

10. The Class Members are putative Plaintiffs who work for Defendant across the country. Defendant requires all employees to utilize Defendant's human resources ("HR") app — which Defendant named 'Amazon A-to-Z' (hereafter the "A-to-Z App") — to process requests for reasonable accommodations. However, the App is, at best, simply not designed to allow an interactive process, and Defendant does not engage in the interactive process and routinely denies requests for reasonable accommodations.

11. Within the Class Members are Sub-Classes.

12. The First Sub-Class employees are employees who were not accommodated because of the systematic discrimination arising out of the A-to-Z App.

THIRD AMENDED COMPLAINT - 3
2:25-cv-00050-JHC

13. This First Sub-Class is subject to a corporatewide, non-region-specific policy of discrimination. That policy demands employees submit requests for reasonable accommodation to a faulty, rigid, robotic, mechanical application system that regularly results in undue and unreasonable days and wrongfully denied applications for reasonable accommodations.

14. This First Sub-Class would cover each and every Amazon employee who sought a reasonable accommodation of some kind through the A-to-Z App, and alleges that the process and policy of relying on the A-to-Z App is inherently faulty and thus inherently discriminatory.

15. This First Sub-Class alleges that the failures that plague the A-to-Z App are such that employees have i) had their reasonable accommodation requests unreasonably delayed or ii) denied because Amazon did not put adequate systems in place to comply with the law.

16. The A-to-Z App disproportionately and unfairly burdens employees seeking reasonable accommodations.

17. The A-to-Z App is, upon information and belief, known to Defendant to be problematic and dysfunctional, but Defendant has not taken reasonable measures to cure the dysfunction.

18. The Second Sub-Class pertains to corporate, non-warehouse, employees who have been told they must return to work under a formal, corporate Return to Office ("RTO") policy.

19. The Second Sub-Class is subject to a corporatewide, non-region-specific policy of discrimination. That policy prohibits any employees from working remotely regardless of the employee's disability and any reasonable accommodations related to their disabilities and need to work remotely. By definition, Defendant's RTO policy does not permit remote work as a reasonable accommodation.

20. Specifically, the policy in question is contained in a news article published publicly by CEO Andy Jassy.

21. The RTO policy does not contain any mechanism for seeking a reasonable accommodation, and, therefore, disproportionately affects disabled employees. The RTO policy

THIRD AMENDED COMPLAINT - 4
2:25-cv-00050-JHC

reads to say:

> Before the pandemic, not everybody was in the office five days a week, every week. If you or your child were sick, if you had some sort of house emergency, if you were on the road seeing customers or partners, if you needed a day or two to finish coding in a more isolated environment, people worked remotely. This was understood, and will be moving forward as well. But, before the pandemic, it was not a given that folks could work remotely two days a week, and that will also be true moving forward—our expectation is that people will be in the office outside of extenuating circumstances (like the ones mentioned above) or if you already have a Remote Work Exception approved through your s-team leader.

22. Upon information and belief, virtually every single instance of an employee requesting remote work has been denied and, instead, Defendant offers inadequate alternatives such as 'noise-cancelling headphones,' even though, in many instances, these 'alternatives' have neither been approved nor recommended by the employees' providers. In many instances, these 'alternatives' run contrary to providers' recommendations for disabled employees' needs.

23. Amazon would face no undue hardship by allowing some disabled employees to work remotely.

24. However, Amazon actively refuses to acknowledge this analysis.

25. Rather, this Second Sub-Class are disabled employees who have identified their need for a remote work accommodation and who have had their accommodation denied solely on the premise that Defendant will not accommodate employees with a remote work exemption.

26. Defendant, with respect to this Second Sub-Class, believes that it is a material job function for each and every single corporate employee to work in person, in an office space.

27. Defendant, upon information and belief, did not perform a factual analysis for each and every single corporate employee role to justify its RTO policy and to decree that being in person, in an office, is a material job function for each and every role.

28. Being in person in an office is not a material job function for the members of the Second Sub-Class.

29. Rather, Defendant merely asserts that 'company culture' suffices as justification to be flagrantly inconsiderate of the law.

HARMAN GREEN
824 Exposition Ave., Suite 8
Dallas, Texas 75226

30.     This Second Sub-Class is not defined by the individual disabilities or the individual job roles but, rather, is defined by the limitation: being unable to work in person, in an office, and by the injury, being denied a reasonable accommodation in the form of a remote work accommodation.

31.     Finally, the Third Sub-Class is best exemplified by warehouse and facility workers (known as "fulfillment center employees") who have been forced on short-term disability ("STD") leaves, or otherwise prohibited from returning to work, after they identified themselves as disabled. The Third Sub-Class is broader, however, than only fulfillment employees, and would cover some corporate employees (including Plaintiff Corriere) who were subjected to mandatory Leave of Absence ("LOA") rather than provided accommodations.

32.     In fact, one of Defendant's onsite medical providers at a fulfillment center told a Plaintiff that Defendant "regularly denies medical reasonable accommodations as simple as extra breaks."

33.     The Third Sub-Class is subject to a corporatewide, non-region-specific policy of discrimination. These employees are subject to a policy of discrimination that prevents them from continuing their employment if they request a reasonable accommodation. Fulfillment center employees who request reasonable accommodations are routinely placed on STD to avoid Amazon from having to accommodate them. This LOA policy covers both fulfillment center and corporate employees, though, upon information and belief, it predominantly affects fulfillment center employees.

34.     The LOA policy discriminates against all disabled employees at Amazon, and particularly disabled fulfillment center employees, by prohibiting them from maintaining meaningful employment, and, instead, simply forcing them out of the workplace.

35.     The LOA policy merely removes those employees from the workplace to maximize efficiency and profitability.  The LOA as an accommodation should be a 'last resort' and not the immediate response to employees who require reasonable accommodations, as making the LOA the first response evidences discrimination against individuals seeking

meaningful employment while disabled.

36. All three Policies are inherently flawed and cause a disparate and negative impact on disabled employees.

37. The A-to-Z App results in mechanical delays and denials of reasonable accommodation requests without considering their merits.

38. Amazon's A-to-Z App results in systematic disability discrimination.

39. Plaintiffs allege for the Class that Defendant underfunds and has not sufficiently supported the centralized mechanisms for employees who request reasonable accommodations. The Class is not defined by any particular disability but by Defendant's centralized corporate policies governing the handling of disability claims, requiring the use of the A-to-Z App and LOA for reasonable accommodations.

40. As well, Amazon routinely constructively, or actually, terminates employees who request a reasonable accommodation.

41. The First Sub-Class, then, is not defined by whether a reasonable accommodation was granted, but contains an overriding, predominate question of whether Defendant's policy of forcing employees rely on the A-to-Z App for disability reasonable accommodation requests, complies with the law, or whether the difficulty in utilizing the app (which contains technical failures) creates illegal disability discrimination.

42. The Second Sub-Class, then, is not defined by whether a reasonable accommodation was granted (because, by definition, Defendant will not provide the sought reasonable accommodation), but contains an overriding, predominate question of whether Defendant's policy both of demanding all employees Return to Office and of offering no pathway for any disabled employee to work remotely as a reasonable accommodation complies with the law, or whether the policy creates illegal disability discrimination.

43. The Third Sub-Class, then, is not defined by whether a reasonable accommodation was granted, but contains an overriding, predominate question of whether Defendant's policy to place employees on STD and LOA rather than accommodate them complies with the law, or

HARMAN GREEN
824 Exposition Ave., Suite 8
Dallas, Texas 75226

whether the policy creates illegal disability discrimination.

## II.    PARTIES

44.    Plaintiff Cook was and is a resident of Texas, and timely filed with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 551-2025-00235. Plaintiff Cook timely filed her claims after receiving a Right to Sue Letter.

45.    Plaintiff Anderson was and is a resident of Arizona and timely filed with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 551-2026-02148. Plaintiff Anderson is awaiting a Right to Sue Letter and will have one in advance of trial.

46.    Plaintiff Joshua Burdi was and is a resident of Arizona, and timely filed with the EEOC, Charge No. 540-2026-00098. Plaintiff Burdi received a Right to Sue letter on December 3, 2025.

47.    Plaintiff Andrew Carmical was and is a resident of Texas, and timely filed with the EEOC, Charge No. 450-2026-02965. Plaintiff Carmical received a Right to Sue Letter on April 7, 2026.

48.    Plaintiff Ethan Corriere was a resident of Nevada and currently is a resident of Texas, and timely filed with the EEOC, Charge No. 487-2025-00384. Plaintiff Corriere received a Right to Sue letter on September 9, 2025.

49.    Plaintiff Michelle Grissom was and is a resident of Texas, and timely filed with the EEOC, Charge No. 450-2025-09043. Plaintiff Grissom received a Right to Sue letter on December 16, 2025.

50.    Plaintiff Johnathan Hodnefield was and is a resident of Washington, and timely filed with the EEOC, Charge No. 551-2026-00111. Plaintiff Hodnefield received a Right to Sue letter on November 18, 2025.

51.    Plaintiff Erica Holland was and is a resident of Nevada, and timely filed with the EEOC, Charge No. 487-2025-03581. Plaintiff Holland received a right to sue letter on January 26, 2026.

52.    Plaintiff Catarina Ly was and is a resident of Washington, and timely filed with

THIRD AMENDED COMPLAINT - 8
2:25-cv-00050-JHC

the EEOC, Charge No. 551-2026-00110. Plaintiff Ly received a Right to Sue letter on November 18, 2025.

53. Plaintiff David Ottenweller was and is a resident of Texas, and timely filed with the EEOC, Charge No. 31C-2024-00634. Plaintiff Ottenweller received a Right to Sue Letter and timely filed his claims.

54. Plaintiff Shannon Pelkie-Theriault was and is a resident of New Hampshire. Plaintiff Pelkie-Theriault will seek her claims under the Washington Law Against Discrimination, but reserves the right to bring timely claims under the Americans with Disabilities Act upon satisfaction of any administrative prerequisites.

55. Plaintiff Christi Springer was and is a resident of Maryland. Plaintiff Springer will seek her claims under the Washington Law Against Discrimination, but reserves the right to bring timely claims under the Americans with Disabilities Act upon satisfaction of any administrative prerequisites.

56. Plaintiff William Stellmon was and is a resident of Texas. Plaintiff Stellmon will seek his claims under the Washington Law Against Discrimination, but reserves the right to bring timely claims under the Americans with Disabilities Act upon satisfaction of any administrative prerequisites.

57. Plaintiff Eleazar Zwillinger was and is a resident of Colorado. Plaintiff Zwillinger will seek his claims under the Washington Law Against Discrimination, but reserves the right to bring timely claims under the Americans with Disabilities Act upon satisfaction of any administrative prerequisites.

58. Plaintiff identified their EEOC charges as "class charges" such that Defendant is on notice about the nature of the class claims.

59. Defendant Amazon Services.com LLC has a principal place of business at 440 Terry Ave N, Seattle, WA 98109, and a registered agent, Corporation Service Company, at 300 Deschutes Way Southwest, Tumwater, WA 98501.

60. Defendant Amazon Services.com LLC is, upon information and belief, the entity that formally employees all Plaintiffs and putative Plaintiffs, or is otherwise the entity to assume for subsidiaries such as Amazon.com, Inc. and Amazon.com LLC.

61. Defendant employs about 1,500,000 employees, is valued in excess of $2,000,000,000,000, and generates approximately $2,000,000,000 in revenue per day.

### III. JURISDICTION AND VENUE

62. Pursuant to 28 U.S.C. §1331 this Court may properly hear Plaintiffs' claims as they arise under a federal statute.

63. Pursuant to 28 U.S.C. §1367 this Court may properly hear Plaintiffs' State law claims as they arise out of the same nucleus of operative fact so as to create the same case or controversy.

64. The Court has general personal jurisdiction over Defendant because, personally or through its agents, Defendant operates, conducts, engages in, or carries on a business or business venture in Washington; is registered with the Secretary of State in Washington as a for-profit corporation; and it maintains its headquarters in Washington.

65. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because it is the district where Defendant resides and has the most significant contacts.

66. As well, this controversy arises out of centralized corporate mandates and policies that affect all employees, and does not affect employees in only a regionalized or localized manner.

### IV. STATEMENT OF FACTS

#### A. First Sub-Class, A-to-Z App

67. Defendant employs/employed Class Members.

68. Class members are disabled.

69. Class members sought one or more reasonable accommodation(s) from Defendant.

THIRD AMENDED COMPLAINT - 10
2:25-cv-00050-JHC

70. Class Members were required to rely on the A-to-Z App, managed by the Disability and Leave Services ("DLS") department.

71. Use of the A-to-Z App results in routine technical failures. These routine technical failures mean that the requests for reasonable accommodation cannot be processed or are significantly delayed.

72. Amazon also has a "MyHR" portal that employees must rely on for human resources functions.

73. The A-to-Z App is the procedural functionality for employees to interface with MyHR.

74. The MyHR portal operates as a corporatewide, non-regional system in the same manner as the A-to-Z App but also displays to employees information such as their remaining vacation time or unpaid time off.

75. MyHR, similar to the A-to-Z App, is plagued with dysfunction such that it causes the same injury and occurrence as the A-to-Z App.

76. The vast majority of Class Members were not accommodated.

77. If a Class Member was accommodated, it took an unreasonable amount of time for that reasonable accommodation to be approved.

78. Class Members would routinely have to resubmit medical information through the A-to-Z App because Amazon failed to properly hold or manage that medical information, and this caused significant, unreasonable delays in their approval for reasonable accommodations if any approval was even generated.

79. The failure to provide a reasonable accommodation in a reasonable and timely manner is both discrimination and evidence of a broader system of discrimination.

80. This First Sub-Class is defined by those Class Members subjected to using the

THIRD AMENDED COMPLAINT - 11
2:25-cv-00050-JHC

A-to-Z App for their reasonable accommodation requests.

## B. *Second Sub-Class, Corporate RTO*

81.      In September 2024, Amazon created a new corporate policy that all corporate employees must 'return to office,' the Return to Office policy identified above.

82.      The policy still controls through today and all employees are subject to the illegal mandate. The Corporate Plaintiffs had to 'return' to an office that many had never been to, and, for many, were then asked to work with teams via videoconference as those team members were spread across the United States and beyond.

83.      The RTO policy is inherently flawed and discriminatory.

84.      The RTO policy does not allow any employee a reasonable accommodation to work remotely as a disability accommodation.

85.      In practice, no employee is allowed to work remotely, which causes discrimination even absent a defined policy stating explicitly that Defendant intends on discriminating against disabled employees.

86.      Even if an employee presents Amazon with an explicit reasonable accommodation request from a medical provider advising that the employee must work remotely, Amazon will not allow that reasonable accommodation.

87.      Upon information and belief, Amazon has falsely claimed that each and every corporate employment role must have an essential function to 'work in person' in an office even though, in reality, such in-office presence is not, nor has ever has been, an essential function of corporate roles.

88.      All Corporate Plaintiffs worked remotely for months or years, and were even hired into roles that were designated as 'remote' or "Virtual." The roles and work never changed.

THIRD AMENDED COMPLAINT - 12
2:25-cv-00050-JHC

89. In essence, the only difference was that Amazon demanded these Plaintiffs return to an office that they had never been to.

90. The RTO policy is as ridiculous, and discriminatory, as a policy that requires all employees to walk up a flight of stairs before beginning the workday as an essential job function for all corporate employees.

91. There is no doubt that every reasonable person would identify that denying elevator access to a wheelchair bound employee is discriminatory.

92. Amazon's purported basis for the RTO policy is to 'boost collaboration,' but failing to allow reasonable accommodations to the RTO policy discriminates against employees who must work remotely.

93. Amazon's corporate employees who are disabled, such as the Plaintiffs identified herein, are then forced to return to the office without a reasonable accommodation only to attend virtual team meetings and one-on-one meetings virtually as many team members, managers, and supervisors are located in other States and cities.

94. Defendant did not engage in the interactive process with the Second Sub-Class, and human resources employees were instructed not to engage in the interactive process for employees seeking a remote work accommodation.

95. Rather, Defendant treated the Second Sub-Class putative Plaintiffs' requests for remote work as a negotiation, not an interactive dialogue.

96. Defendant, as a negotiation tactic, merely demanded 'take it or leave it' alternative accommodations and provided no further recourse to meaningfully engage in an interactive process.

97. Under the law, no employer is allowed to simply deny a reasonable accommodation request solely because of the nature of the request absent an undue hardship.

THIRD AMENDED COMPLAINT - 13

HARMAN GREEN
824 Exposition Ave., Suite 8
Dallas, Texas 75226

98.     Rather, the employer is obligated to provide a reasonable accommodation unless it would cause the employer an undue hardship.

99.     Defendant cannot show that allowing the Second Sub-Class remote work reasonable accommodations would cause an undue hardship.

100.    In fact, Defendant did not even make an effort to determine whether remote work would cause an undue hardship. Defendant merely decreed that all corporate employees were subject to the RTO policy without regard to the employee's job functions, limitations, or any other individualized aspect of employment.

### C. *Third Sub-Class*

101.    Amazon employs Class Members in fulfillment centers, in roles that are require in-person presence by the very nature of their job duties.

102.    This Third Sub-Class has been subject to discriminatory practices in that Defendant refuses to allow disabled warehouse employees to work while disabled.

103.    Rather, these Third Sub-Class putative Plaintiffs are forced onto medical leaves and LOA when they could otherwise be reasonably accommodated.

104.    Amazon routinely prevents disabled warehouse employees from meaningful employment because it prioritizes efficiency and productivity over offering the same employment opportunities to disabled employees.

105.    If a warehouse employee identifies themselves as disabled, very often they are required to take a LOA and cannot perform work in the fashion as prior to their identification as disabled.

106.    This practice is inherently discriminatory in that it unfairly deprives disabled employees access to the same employment rights as nondisabled employees.

107.    Upon information and belief, Amazon maintains its own Short-Term

THIRD AMENDED COMPLAINT - 14
2:25-cv-00050-JHC

Disability leave policy, administered through DLS, and relies on this STD policy to remove disabled employees from warehouse floors.

108. Amazon would prefer to maximize performance and profit than allow disabled employees meaningful opportunities to be employed with a reasonable accommodation.

109. Amazon accomplishes this through the LOA policy.

110. Amazon shelves disabled warehouse employees and places them on STD and LOA rather than accommodate them.

### D. *General Facts common to all Plaintiffs*

111. Defendant employed Plaintiffs.

112. Plaintiffs were all qualified for their employment.

113. Plaintiffs show, by and through their individual facts, that they were qualified based on the longevity of their employment and their performance bonuses, promotions, or other forms of approval.

114. Plaintiffs are all disabled.

115. Each Plaintiff identifies a disability that impairs major life functions.

116. Any individualized nature of Plaintiffs and putative Plaintiffs' disabilities are immaterial insofar as the class is defined by the policies and the injury.

117. For many years, since the start of the COVID-19 Pandemic, all Corporate Plaintiffs, or, at the very least, the overwhelming vast majority, in the Second Sub-Class, had been working remotely, and, for long periods, sometimes years, exclusively remotely.

118. All Corporate Plaintiffs, and the putative Plaintiffs of the Second Sub-Class, sought to continue to work remotely as a reasonable accommodation as Defendant began to encourage employees to return to the office full time.

119. Defendant, first as a matter of practice and, now, as a matter of formal policy,

THIRD AMENDED COMPLAINT - 15

HARMAN GREEN
824 Exposition Ave., Suite 8
Dallas, Texas 75226

does not permit employees to work remotely as a reasonable accommodation for a disability.

120. Defendant has a policy demanding all employees work in person for 'company culture.'

121. Company culture is not an essential job function.

122. Even if a Plaintiff can and did show Defendant that their medical provider recommended against working in person, Defendant refused to accommodate that Plaintiff with a remote work reasonable accommodation.

123. If a reasonable accommodation is denied, Defendant does not allow for appeals.

124. If a Plaintiff does not accept an offered alternative accommodation, which are exclusively in person accommodations, Defendant treats it as a 'preferential denial' even if the employee states that the offered accommodation is inadequate.

125. Defendant does not entertain a dialogue about whether a remote work reasonable accommodation is appropriate for a Plaintiff because Defendant simply will not allow any employee to work remotely.

126. Defendant terminates many employees who are unable to work without a reasonable accommodation.

127. As well, through denials of reasonable accommodations, some employees are compelled to abandon their employment simply because it is impossible for them to remote into the office in person.

### E. *Andrew Anderson – Second Sub-Class*

128. Defendant hired Plaintiff Anderson originally in November 2023 as a temporary Administrative Support Assistant and promoted him in February 2024 as a Transportation Specialist at $22.05 per hour.

THIRD AMENDED COMPLAINT - 16

HARMAN GREEN
824 Exposition Ave., Suite 8
Dallas, Texas 75226

129. On or about July 2024, Plaintiff Anderson was involved in a car accident that shifted a disc in his lumbar region, causing Plaintiff Anderson to be diagnosed with severe radiculopathy one month later.

130. The severe radiculopathy causes severe pain and limits mobility for walking and commuting.

131. Plaintiff Anderson is only able to remain in a sitting or standing position for 20 minutes at a time without suffering immense pain and must sometimes manage this with supine physical therapy exercises.

132. Further, minor vibrations and bumps during vehicular travel can trigger intense muscle spasms for Plaintiff Anderson, meaning extended trips in cars can be incredibly painful.

133. On August 31, Plaintiff Anderson submitted his first accommodation request to Defendant to work remotely.

134. On September 1 & 10, DLS requested further information from Plaintiff Anderson and his healthcare provider.

135. On September 15, while Plaintiff Anderson was waiting for his scheduled doctor appointment on September 19, DLS closed the case and instructed him to open a new case once he obtained medical documentation.

136. Plaintiff Anderson responded that he had an appointment scheduled with his doctor.

137. Ultimately, with manager approval, Plaintiff Anderson opted to work remotely without a formal accommodation request until April, when Amazon began to bring its anti-remote work pressure campaign to new heights.

138. Throughout this period, Plaintiff Anderson remained able to perform all essential job functions while working from home and was not informed of any performance

THIRD AMENDED COMPLAINT - 17
2:25-cv-00050-JHC

concerns.

139. On April 14, Plaintiff Anderson submitted a new accommodation request, to which a DLS case worker stated that if an accommodation is intended to be permanent, the word "permanent" must be clearly indicated in the paperwork.

140. On April 29, Dr. Cynthia Ventry submitted Defendant's documentation and explicitly stated she recommends that Plaintiff Anderson "work from home 100%". As mandated to report in the form, she included that the next scheduled appointment is October 29.

141. On May 7, Senior Accommodation Consultant ("SAC") Erin Clay sent an email to Plaintiff Anderson confirming they understand what his doctor's recommendations were.

142. Twenty days later, SAC Alex Dubberly, the second consultant assigned to his case, only a temporary 6-month work-from-home accommodation, deceitfully setting it to expire October 29 after which Plaintiff Anderson would have to resubmit his information.

143. On July 1, Plaintiff Anderson checked in on his sit-stand desk that was supposed to have arrived by that point. Two days later, the delivery was made.

144. On October 3, following Mr. Dubberly's stated procedure, Plaintiff Anderson contacted DLS within the required timeframe to request an extension of his work-from-home accommodation.

145. On October 10, Danielle, on behalf of Mr. Dubberly, contradicted Defendant's earlier stated policies and claimed that the case was closed upon approval, meaning Plaintiff Anderson had to open another accommodations case.

146. This was the third consultant involved in his case.

147. In the same email, she further lied to Plaintiff Anderson by stating that Dr. Ventry provided an "end date," referring to the next scheduled appointment date Defendant

THIRD AMENDED COMPLAINT - 18

HARMAN GREEN
824 Exposition Ave., Suite 8
Dallas, Texas 75226

required she put in.

148. On October 15, Defendant redundantly requested medical documentation again, and Plaintiff Anderson uploaded the RFI form as instructed.

149. On or about this time, Ms. Dubberly held a call with Plaintiff Anderson, where in response to his question about whether it was required he go to Amazon-approved healthcare facilities to have documentation signed she affirmed he did.

150. Each visit to an Amazon-approved healthcare facility not only requires Plaintiff Anderson pay for rideshares to and from the facility, but also that he pay a $25 "LOA/Accommodation Visit" fee.

151. On October 29, Ms. Dubberly denied his reasonable WFH request and unilaterally decided that inadequate in-office accommodations in the form of a sit/stand desk, a modified work schedule, and commuter benefits would address his disabilities — wholly ignoring his provider's restriction to sit for no more than 30 minutes at a time.

152. Plaintiff Anderson responded requesting explicitly to formally re-engage in the interactive process, explaining that the offered accommodations did not comply with his doctor's medical restriction, and that Plaintiff Anderson successfully completed his duties with a reasonable WFH accommodation.

153. On November 2, Case Worker Katarina Mendoza, the fourth consultant involved in his case, responded and reaffirmed the same in-office accommodation without modification.

154. Plaintiff Anderson responded that he would accept the accommodations while emphasizing that the 3 day per week commute causes him significant pain.

155. Shortly afterward, the case was closed and Plaintiff Anderson received a survey asking: "Have we implemented an accommodation for you?" to which Plaintiff

THIRD AMENDED COMPLAINT - 19
2:25-cv-00050-JHC

Anderson responded "No."

156. On November 29, despite continuous communication from Plaintiff Anderson about his scheduled doctor appointments and barriers to obtaining the overextensive information Defendant requested, Defendant closed the case citing documentation deadlines

157. On December 3, Plaintiff Anderson opened another accommodation case.

158. Caseworker Joshua Jones contacted him and advised that updated medical documentation was required.

159. Plaintiff Anderson obtained a new RFI completed by a different healthcare provider, which again documented his medical restrictions, including the inability to tolerate commuting due to pain and symptoms.

160. On December 18, Defendant again offered a partial accommodation, this time including an ergonomic chair.

161. In response, Plaintiff Anderson accepted the accommodation but explicitly stated that it did not resolve the commute-related medical restriction and continued to cause increased pain, as documented by his physician.

162. Defendant did not acknowledge this communication.

163. On January 5, 2026, Defendant closed his case and issued an email stating that Plaintiff Anderson had declined the accommodation, despite his written acceptance.

164. No effective accommodation has since been implemented.

165. As of November 2025, Plaintiff has paid 5 charges of $25 for visits to Defendant-approved healthcare facilities to obtain signed documentation.

### F. *Joshua Burdi – Second Sub-Class*

166. Plaintiff Burdi is an employee located in Office AZA7 - 1665 West Alameda Drive Suite 125, Tempe, AZ 85282 as a Programmer Analyst II (Programmer/Analyst II) and

THIRD AMENDED COMPLAINT - 20
2:25-cv-00050-JHC

has been employed by Amazon for over 5 years.

167. Plaintiff Burdi has ADHD, which impairs his ability to exert concerted attention toward singular tasks and is regularly regarded as an impairment to many major life functions.

168. Because of his ADHD, Plaintiff Burdi can become distracted by crowded areas and struggles to maintain the same level of productivity at work in person than remotely.

169. Stated differently, distractions resulting from high-traffic work areas replete with overlapping sights and sounds prevent him from being able to process information efficiently, including reading and focusing on tasks, enough to meet the demands of his workload.

170. Plaintiff Burdi has had a remote work reasonable accommodation since the COVID-19 pandemic started in 2020.

171. On April 3, 2023, Plaintiff Burdi requested a Work-From-Home (WFH) reasonable accommodation, explaining that working remotely during COVID had proven to be highly beneficial for productivity.

172. On April 4, 2023, Gayle Jackson was assigned to the case and requested documentation from Plaintiff Burdi's doctor.

173. On April 14, 2023, Plaintiff Burdi provided the requested documents completed by both himself and his doctor.

174. On April 18, 2023, Plaintiff Burdi was asked to provide 'alternative' options to working remotely that could potentially be performed in the office.

175. On April 28, 2023, Plaintiff Burdi's remote work reasonable accommodation was approved indefinitely by Manager Joshua Garrison and relevant stakeholders as an 'off the record' reasonable accommodation.

HARMAN GREEN
824 Exposition Ave., Suite 8
Dallas, Texas 75226

176. This approval was generated outside of the A-to-Z App.

177. This approval also shows that it was not an essential function of Plaintiff Burdi's job that he report in person.

178. On May 26, 2023, Plaintiff Burdi was officially diagnosed with all three types of ADHD.

179. On December 14, 2023, DLS opened a new case stating that Plaintiff Burdi had requested a new reasonable accommodation.

180. Eric Vaughan was assigned as Case Manager.

181. Plaintiff Burdi did not, in fact, request a new reasonable accommodation.

182. From December 14, 2023 – January 8, 2024, Plaintiff Burdi engaged in multiple calls with Eric Vaughan.

183. During one of the calls, Plaintiff Burdi asked what would happen if the alternate reasonable accommodations did not work and whether remote work would remain an option.

184. Plaintiff Burdi was informed that if those reasonable accommodations failed, DLS would most likely place Plaintiff Burdi on unpaid Leave of Absence (LOA) and reassign Plaintiff Burdi to a different team.

185. On January 8, 2024, Plaintiff Burdi sent updated doctor's notes to Eric Vaughan at DLS.

186. On February 14, 2024, alternate in-office reasonable accommodations were approved indefinitely. Plaintiff Burdi did not request alternate in-office reasonable accommodations, and they were merely thrust upon him as a take-it-or-leave-it option. It was clear that Amazon was not going to allow Plaintiff Burdi to work remotely.

187. From February 14 – March 14, 2024, Plaintiff Burdi attempted to work in the

HARMAN GREEN
824 Exposition Ave., Suite 8
Dallas, Texas 75226

office several times; however, the reasonable accommodations were not in place. There was no chair setup, and no way to adjust the temperature in the office.

188. On March 14, 2024, as alternate reasonable accommodations were still not ready, Plaintiff Burdi was again approved to work remotely until the office setup was complete.

189. Stated differently, it was not an essential function of his job for Plaintiff Burdi to work in person.

190. On April 30, 2024, Plaintiff Burdi received updated approval from DLS stating that 'office reasonable accommodations' were ready.

191. When attempting to return to the office that day, Plaintiff Burdi was offered a shared office with another associate.

192. Plaintiff Burdi pointed out to Antonio from HR that this did not constitute a private office as required by the approved reasonable accommodation.

193. In an email thread, HR representative Darby Price stated they could not provide a private office due to space constraints.

194. Paula Shepard responded, asking whether Plaintiff Burdi could continue to work remotely under those circumstances.

195. Ms. Price sought additional information on how the original approval was granted.

196. John Bashaar responded that only a double-occupancy office could be offered and that the original WFH approval should not have been granted, explaining that the reassessment was intended to ensure compliance with RTO guidance.

197. On May 1, 2024, Plaintiff Burdi had a conversation with Antonio via Chime, during which Plaintiff Burdi was informed again that if the reasonable accommodations did not work, an unpaid LOA and reassignment would likely follow.

THIRD AMENDED COMPLAINT - 23
2:25-cv-00050-JHC

198. After questioning the morality, ethics, and legality of this situation, Plaintiff Burdi did not have any choice but to use the double-occupancy office solely to preserve his ability to have meaningful employment.

199. Refusing the same would have caused an existential threat to Plaintiff Burdi's employment.

200. Shortly thereafter, Plaintiff Burdi indicated intent to seek legal counsel.

201. On May 2, 2024, Plaintiff Burdi responded to the email thread, explaining that acceptance of the reasonable accommodations occurred only because Plaintiff Burdi felt threatened and coerced—facing a choice between subpar reasonable accommodations or the risk of unpaid LOA and financial hardship.

202. Plaintiff Burdi reiterated the intent to seek legal counsel.

203. On May 6, 2024, Plaintiff Burdi received an email stating that Amazon Legal was reviewing the situation and that Plaintiff Burdi should continue to work remotely until a decision was made.

204. Around this time, Paula Shepard became the new case manager.

205. From May 6 – May 15, 2024, Plaintiff Burdi had a call with Paula Shepard, explained all prior events, and was informed that WFH remained a valid option.

206. Ms. Shepard stated she would work to ensure that arrangement continued.

207. On May 15, 2024, Plaintiff Burdi received an email stating that in-office reasonable accommodations were again approved.

208. However, this was sent only to stakeholders and to Plaintiff Burdi's personal email (rarely checked), not the work email used for most prior communications. Plaintiff Burdi did not see the message at the time.

209. From May 15, 2024 – March 14, 2025, Plaintiff Burdi continued to work

HARMAN GREEN
824 Exposition Ave., Suite 8
Dallas, Texas 75226

remotely, as the last received communication indicated that WFH should continue until Legal provided further instruction.

210. Plaintiff Burdi's MyHR portal still listed WFH as the approved reasonable accommodation.

211. On March 14, HR representative Darby Price called to ask why Plaintiff Burdi had not returned to the office.

212. Plaintiff Burdi responded that MyHR still showed WFH approval and that the last instruction received was to continue until Legal decided otherwise.

213. Ms. Darby then informed Plaintiff Burdi of the prior email that had gone only to the personal account.

214. Plaintiff Burdi responded by email, stating that this new reasonable accommodation had never been agreed to.

215. On March 17, Amanda Magana became the new case manager and replied to the email thread.

216. From March 18 – March 25, Plaintiff Burdi had a call with Ms. Magana, explaining everything that had transpired. Amanda stated she wanted to rebuild the reasonable accommodation from scratch since the prior case had become disorganized due to the repeated back-and-forth.

217. On March 25, Plaintiff Burdi submitted a new reasonable accommodation request in MyHR, again requesting to work remotely.

218. On April 22, Plaintiff Burdi was told to attempt in-office work, with permission for Plaintiff Burdi to continue working remotely until all in-office reasonable accommodations were in place.

219. On June 16, 2025, Ms. Magana emailed a ramp-back plan, confirming that in-

THIRD AMENDED COMPLAINT - 25
2:25-cv-00050-JHC

office reasonable accommodations were ready.

220. The ramp-back plan consisted of three weeks at zero days in office, followed by three weeks at one day, and so on, until full RTO was achieved.

221. On July 29, 2025, Plaintiff Burdi responded to the reasonable accommodation approval email, stating that the reasonable accommodations were not working.

222. The private office still had excessive noise, causing loss of focus and concentration, and the fan provided for temperature control only circulated hot air.

223. At this point, Plaintiff's medical providers had only supported him working remotely, and did not approve or recommend Plaintiff Burdi to work in an office with any reasonable accommodations.

224. On August 12, 2025, Plaintiff Burdi replied again, reiterating the same concerns and ensuring that Amanda was directly included in the email thread, as no response had yet been received.

225. On August 19, 2025, still having received no reply, Plaintiff Burdi followed up again with similar information, this time including Manager Danielle and Senior HRBP Tracye in the thread.

226. On August 20, 2025, Plaintiff Burdi received an automated email from DLS asking about the status of reasonable accommodations and responded with the same information in an effort to prompt further action.

227. To this day, Plaintiff Burdi continues to work without any form of a reasonable accommodation.

228. Plaintiff Burdi's essential job functions do not require that he work at an office in person, as evidenced by his many years of working remotely.

229. As well, Plaintiff Burdi is, and has always been, qualified for his role, as

THIRD AMENDED COMPLAINT - 26
2:25-cv-00050-JHC

evidence by his many years of continued, successful employment.

### G. *Andrew Carmical – Second Sub-Class*

230. Plaintiff Carmical is a Supply Chain Manager II, hired February 17, 2020.

231. Plaintiff Carmical has been diagnosed with ADHD, meaning he is particularly susceptible to distractions from noises and extraneous stimuli.

232. Plaintiff Carmical's major life functions are inhibited and impaired in that he must make additional efforts to concentrate on routine and day to day tasks without succumbing to distractions.

233. These distractions depress his productivity, leading him to have to finish his duties outside of normal business hours.

234. Stated differently, Plaintiff Carmical's major life functions, such as reading, concentrating, and following tasks are impaired by crowded or noisy environments with external stimuli.

235. Further, none of Plaintiff Carmical's team works at his designated site in the Dallas-Fort Worth area, providing no justification that he work in-person.

236. On December 24, 2024, Plaintiff Carmical applied for a reasonable remote work accommodation and timely submitted all necessary documentation.

237. Nearly two weeks later sans response, Plaintiff Carmical followed up on his accommodations request.

238. On January 10, 2025, Senior Accommodations Consultant ("SAC") Nikki Reynolds informed Plaintiff Carmical that the case remained pending and he was permitted to work from home in the interim.

239. On January 16, 2025, SAC Shawn Laubscher, the second consultant assigned to his case, informed Plaintiff Carmical that all in-office accommodations must be attempted

THIRD AMENDED COMPLAINT - 27
2:25-cv-00050-JHC

before Defendant would approve a reasonable WFH accommodation.

240. Mr. Laubscher informed Plaintiff Carmical that Defendant had approved a private office, noise cancelling headphones, a white noise machine, and Work Wellness Coaching in place of a reasonable WFH accommodation.

241. At this point, Plaintiff Carmical was working in person 3 days per week, which he explained to the Mr. Laubscher was because the DFW11 site is already out of workspace.

242. Plaintiff Carmical further explained the extreme difficulty in reserving conference rooms and noted that he already tried noise cancelling headphones with white noise, which did not help manage his susceptibility to distractions.

243. On January 21, 2025, Plaintiff Carmical sent an email further explaining he already tried a private office from mid-March 2024 to June 2024, and noted the offices are all glass with sliding glass doors that don't block noise or visual distractions. He emphasized that his doctor detailed remote work as the solution.

244. Mr. Laubscher, ignoring Plaintiff Carmical's explanations, confirmed that a private office would be sought.

245. On January 24, 2025, Mr. Laubscher unilaterally decided in an email sent to Plaintiff Carmical that the limitations communicated by Plaintiff Carmical's healthcare provider can be accommodated with a private office.

246. A private office was never provided to Plaintiff Carmical.

247. He further explained that though he was trying to find an office without see-through windows, Defendant were unwilling to provide his reasonable WFH accommodation, causing significant distress.

248. Between January 29 - March 30, 2025, as a result of this emotional distress caused by Defendant, Plaintiff Carmical went on a protected medical leave.

HARMAN GREEN
824 Exposition Ave., Suite 8
Dallas, Texas 75226

249. As if to mock Plaintiff Carmical, Mr. Laubscher confirmed that Plaintiff's reasonable WFH request was approved from December 5, 2024 – April 18, 2025, and that a private work area — instead of a private office — was approved starting April 21.

250. On April 15, Plaintiff Carmical explained that nothing in his current work arrangement, most of all his desk, had changed, and emphasized that his physician's requirements were not met.

251. On April 16, 2025, Mr. Laubscher asked Plaintiff Carmical where he would prefer his desk be situated.

252. On April 17, 2025, Plaintiff Carmical re-emphasized that he already tried the current accommodations Defendant is offering to no avail and inquired again about the private office.

253. On April 18, 2025, Mr. Laubscher offered full wall dividers in the corner, which Plaintiff Carmical explained was not feasible due to the layout and requested his originally approved private office. He again re-emphasized that the current accommodations do not work and requested his previously approved private office.

254. On April 21, 2025, Mr. Laubscher confirmed Plaintiff Carmical could continue working from home while Defendant sorted out his accommodations.

255. On April 30, 2025, Mr. Laubscher informed Plaintiff Carmical that there were no available private offices and offered him a desk in a "low-traffic" work area with earplugs.

256. On May 1, 2025, Plaintiff Carmical expressed serious concern about the change in accommodations from the originally-promised private office, and states that the new desk and earplugs are not comparable to them.

257. The next day, Mr. Laubscher informed Plaintiff Carmical that Defendant had changed his accommodation to a "private work area" and gave Plaintiff Carmical an ultimatum

HARMAN GREEN
824 Exposition Ave., Suite 8
Dallas, Texas 75226

of either an alternate desk location, or a relocation to another city without a relocation package.

258. On May 6, 2025, Plaintiff Carmical reiterated that this did not meet his physician's requirements and that the current accommodations did not work. Plaintiff Carmical requested continued remote work until a private office became available in the Dallas-Fort Worth area.

259. On May 8, 2025, Mr. Laubscher denied Plaintiff Carmical's reasonable WFH request again, instead continuing to force Plaintiff Carmical into an in-person work environment. He offered Plaintiff Carmical a desk shade to reduce visual distractions.

260. On May 9, 2025, Mr. Laubscher offered Plaintiff Carmical a different assigned desk.

261. In response, Plaintiff Carmical re-emphasized that this did not meet his physician's requirements.

262. On May 19, 2025, Plaintiff Carmical received a notice of transfer to a new office building, and requested confirmation that his previously approved private office accommodation would be fulfilled.

263. On May 22, 2025, Mr. Laubscher responded that no private offices were available at this new site and offered to work with HR to identify alternate hubs with private office space. Again, Mr. Laubscher did not offer Plaintiff Carmical relocation assistance.

264. On June 12, 2025, Mr. Laubscher informed Plaintiff Carmical that once relocated to DFW20, Plaintiff Carmical will be assigned to a "private work area."

265. On July 1, 2025, Plaintiff Carmical reported that the overhead lighting and distracting noise levels were much worse at the new location, pushing him to purchase his own over-ear noise cancelling headphones. Seeing his old desk remained unassigned, Plaintiff Carmical asked if it were possible to move back to the previous office.

HARMAN GREEN
824 Exposition Ave., Suite 8
Dallas, Texas 75226

266. On July 3, 2025, Mr. Laubscher responded that DLS was unable to relocate the assigned building and once again offered desk shade and a different pair of headphones, ignoring that Plaintiff Carmical had attempted these accommodations to no avail.

267. Almost 10 days later, Mr. Laubscher followed up and asked for confirmation on desk shade and headphones

268. The following day, considering Mr. Laubscher continued to ignore that he had already tried the headphones, Plaintiff Carmical agreed to try different noise cancelling headphones.

269. On or about August 2025, Plaintiff Carmical once again attempted to use both Defendant's provided headphones and his own, neither of which alleviated his disabilities.

270. On October 3, 2025, Plaintiff Carmical submitted a new request for work from home accommodation after trying to work in office from July to August with headphones, which was also denied outright.

271. Plaintiff Carmical felt he had no recourse but to report in-office and suffer.

272. Reporting in-office has forced Plaintiff Carmical to endure a significant deterioration in his health, as well as make unduly burdensome changes to his life.

273. For example, the lack of accommodation has distressed Plaintiff Carmical so greatly that he has developed unprecedented sleeping issues severe enough for his physician to prescribe medication to treat.

274. He has also had to change his medication managing his ADHD several times, as he has been prescribed the highest permissible dosage to combat the ever-present in-office distractions impeding his ability to concentrate.

275. Despite meeting high-bar expectations, this marks the first year Defendant has not coupled his performance with a raise.

THIRD AMENDED COMPLAINT - 31
2:25-cv-00050-JHC

276. On or about April 2026, Plaintiff Carmical opened a new reasonable WFH accommodation case, which remains pending.

### H. Plaintiff Cook – First and Third Sub-Class

277. Plaintiff Cook is a disabled veteran with both physical and non-physical disabilities.

278. Plaintiff Cook began her employment with Amazon in June 2022.

279. After approximately a year of employment, June 2023, Plaintiff Cook began to experience excessive bleeding, due to uterine fibroid problems, that would require her attention at work to be taken for short periods of time.

280. Plaintiff Cook also suffers from Post Traumatic Stress Disorder ("PTSD").

281. Plaintiff Cook initially requested reasonable accommodations from her manager in the form of remote work and, as well, fifteen minute breaks throughout the day to manager her bleeding.

282. Plaintiff Cook's manager refused to engage in the conversation, saying she must go through the corporate A to Z App, which manages all employees' HR concerns.

283. Plaintiff Cook did go through that A to Z App.

284. Initially, Plaintiff Cook was relieved that Amazon was giving her an opportunity to monitor her health, as she was given an approved medical leave towards the end of 2023.

285. Plaintiff Cook's leave was then extended over her objection. She was subject to the LOA policy.

286. Plaintiff Cook was told by a case manager that her reasonable accommodations "will probably be denied."

287. Plaintiff Cook was able to return to work and wanted to return to work, but

THIRD AMENDED COMPLAINT - 32
2:25-cv-00050-JHC

was denied the ability to do so.

288. Plaintiff Cook was told, by that same case manager, that she should try to ask for a position change and that she should discuss a new position with her manager.

289. Plaintiff Cook's manager only referred her back to HR and the A to Z App.

290. This happened again and again.

291. Plaintiff Cook was slated to remain on that leave through January 17, 2025.

292. Plaintiff Cook now is in limbo, explained further below, unsure whether she should return to work remotely, or whether she is going to be reassigned to another position and/or another department.

293. Plaintiff Cook has not been able to return to her position as Cloud Engineer due to Amazon not approving reasonable accommodations and was told by her management (M. Santhankrishnan and D. Pereida) that they could not honor or approve reasonable accommodations without approval through the A to Z App.

294. This is a common problem with Defendant: employees are asked to pursue reasonable accommodations through the A to Z App, and employees cannot meaningfully explain their disabilities or engage with Defendant about what reasonable accommodations are necessary. As well, Defendant consistently has multiple case managers assigned and reassigned to cases, causing confusion for the case managers and employees.

295. After being out on leave for months, Plaintiff Cook informed Defendant that she was suffering from undue stress because she was out of work and not being paid.

296. Plaintiff Cook's medical providers informed her that they believe she is being discriminated against.

297. Plaintiff Cook's medical providers specifically informed Defendant, on September 13, 2024, that her continued leave was negatively affecting her mental health,

THIRD AMENDED COMPLAINT - 33
2:25-cv-00050-JHC

stating "the way she has been reacting to the interactions between herself AWS, her medical leave, and short-term disability leave has exacerbated her symptoms requiring extended treatment and modification of prescription medications." Plaintiff Cook's expected return to work date was December 30, 2024.

298. Plaintiff Cook has been pushed into a never-ending cycle of disability leave pigeonholing her, as Amazon uses the A to Z App to stifle and hide disabled employees.

299. Plaintiff Cook's mental health deteriorated rapidly because of Defendant's complete and utter failure to provide any kind of a reasonable accommodation.

300. Plaintiff Cook's story is representative of a class of claims.

301. Many employees share the story that Amazon refuses to engage in the interactive process via managers, and, instead, demands employees engage through the A to Z App, where their reasonable accommodation requests are never discussed with any legitimacy.

302. Congress has taken notice that the A to Z App fosters an illegal work environment that disproportionately affects disabled employees. [1]

303. The Disability Leave Services (DLS) department utilizes the A to Z App and "Although workers are supposed to be assigned a caseworker, many workers reported that they were either not given one or could not reach anyone at DLS."[2]

304. The same is true for Plaintiff Cook as her requests to return to work were ignored.

---

[1] United States Senate Committee on Health, Education, Labor, and Pensions, Chairman Bernard Sanders, THE "INJURY-PRODUCTIVITY TRADE-OFF": HOW AMAZON'S OBSESSION WITH SPEED CREATES UNIQUELY DANGEROUS WAREHOUSES, Majority Staff Report, December 2024.
[2] Id.

THIRD AMENDED COMPLAINT - 34
2:25-cv-00050-JHC

305. Plaintiff Cook, for months, had her paperwork juggled through the A to Z App entirely to her detriment.

306. Repeatedly, Plaintiff Cook went through cycles of being told that her disability reasonable accommodation paperwork was being processed, only for that same paperwork to become 'lost' in the A to Z App, and another HR person would, again, ask Plaintiff Cook to submit her paperwork.

307. Despite Plaintiff Cook being on a medical leave for months, she was told, on or about March 29, 2024, April 5, 2024, June 12, 2024, August 13, 2024, and September 19, 2024 that her medical paperwork was 'insufficient' despite Plaintiff Cook uploading everything to the A to Z App.

308. On these occasions, and others, Defendant treated Plaintiff Cook as being on leave without proper medical authorization.

309. Plaintiff Cook was told that she would have to return to work without any reasonable accommodations whatsoever.

310. On many occasions, Defendant failed to properly consider Plaintiff Cook's medical documentation because it preferred to rely on the faulty A to Z App application than on an actual case manager to support Plaintiff Cook.

311. Plaintiff Cook remedied every instance of the A to Z App's failure by providing, once again, all the necessary medical paperwork sought, and Defendant placed Plaintiff Cook back on medical leaves.

312. Plaintiff Cook's providers had asked that she return to work, work with occasional fifteen minute breaks, and to work remotely, but all requests have been ignored by Amazon, who continues to stuff Plaintiff Cook into a forced disability leave without any engagement in the interactive process.

HARMAN GREEN
824 Exposition Ave., Suite 8
Dallas, Texas 75226

313. Plaintiff Cook's constant denials and futile engagement with the A to Z App has caused her extreme stress and has seriously impaired her ability to maintain a reliable income.

314. On or about February 7, 2025, Plaintiff Cook had a meeting with her manager.

315. Her manager expressed that there were 'some emails' going back and forth about Plaintiff Cook's reasonable accommodation and that they were 'pretty sure' the reasonable accommodation requests had been denied.

316. That manager then asked whether Plaintiff Cook had been notified; she had not been.

317. Plaintiff Cook's manager then explicitly expressed that Plaintiff Cook's job absolutely could be accommodated and she could work remotely without issue.

318. In fact, evidencing that Defendant had not had any substantive conversation with anyone about Plaintiff Cook, her reasonable accommodations, and her work responsibilities, Plaintiff Cook's manager stated that if she does not get any reasonable accommodations, he will 'fight for her' so that she can work and be accommodated.

319. Approximately eleven days later, Plaintiff Cook still had no formal notification about whether her reasonable accommodations were approved and whether she could/should return to work.

320. Instead, when she tried to log into the A to Z App portal, she was presented with this message:

HARMAN GREEN
824 Exposition Ave., Suite 8
Dallas, Texas 75226



321.

322.     A 503 error page most often represents that a system is down for maintenance or is unavailable because of excessive usage.

323.     Defendant, arguably the largest corporation in the world, spends sufficient funds to keep their marketplace active 24/7 (Amazon.com), but not their application for employees to seek reasonable accommodations at work.

324.     Despite Plaintiff Cook, her doctors, and her managers all agreeing that she should return to work with reasonable accommodations, Defendant did not allow her to return to work, and would not accommodate her, based on conversations behind closed doors locked in an application that Plaintiff Cook cannot even access.

325.     Plaintiff Cook was approved for leave for the period 5-24-2024 through 12-29-2024 over her objection and request to return to work.

326.     In efforts to return to work, Plaintiff Cook also requested job changes as a request for a reasonable accommodation.

327.     Through Amazon's continued confusion, Plaintiff Cook has been approved to work in another role, and has had that same approval withdrawn.

328.     Plaintiff Cook is currently on leave, and her provider's analysis is that

HARMAN GREEN
824 Exposition Ave., Suite 8
Dallas, Texas 75226

Defendant's failure to accommodate her has significantly and negatively impacted her health.

### I. *Ethan Corriere – First and Third Sub-Classes*

329. In June 2022, Plaintiff Corriere was hired as an Amazon Dedicated Cloud ("ADC") Engineer, working as a dedicated cloud-based employee on top-secret government projects.

330. Plaintiff Corriere has a military background which forms the basis for his disability, PTSD, in which flashbacks can be triggered by a variety of sudden sounds or sudden spikes in adrenaline that can be rampant in an office setting.

331. To manage his disability, he must be able to control his environment, allowing him to minimize triggers that would otherwise impact his ability to maintain a stable emotional state and diligently perform his duties.

332. Plaintiff Corriere served in Iraq and Afghanistan, and his PTSD is considered "100% permanent" and a qualified disability.

333. At all times, Defendant considered Plaintiff Corriere disabled, as Plaintiff Corriere submitted documentation from his medical provider indicating he had PTSD and, as a result, the provider recommended that he limit his time in noisy environments, high foot traffic areas, and spontaneous social interactions.

334. Originally, Mr. Corriere was hired to work remotely.

335. In February 2023, he returned to the office for three days a week.

336. By June 2023, he transitioned to an Amazon Web Services Managed Operations role as a systems engineer, which was not classified as top secret.

337. In October 2023, Plaintiff Corriere requested to work from remote full-time due to PTSD.

338. Case manager Lin Nicely responded that "I understand that you are asking

THIRD AMENDED COMPLAINT - 38

HARMAN GREEN
824 Exposition Ave., Suite 8
Dallas, Texas 75226

about remote work, which is not something that a case manager can assist you with. We are specialist in taking a leave of absence."

339. Mr. Corriere even stated, specifically, "I am not looking for any leave of absence at the moment" and wanted meaningful, remote, employment.

340. Ms. Nicely responded that "I would recommend speaking to MyHR."

341. At that time, Plaintiff Corriere was on a hybrid work schedule but sought a full-time remote reasonable accommodation.

342. Stated differently, it was not an essential function of his job for Plaintiff Corriere to work in person.

343. Many Plaintiffs were hired for remote work and performed their work remotely. Given that no material change occurred to their job functions, there was no basis to demand on site, in office work requirements.

344. This request was denied, leading to a prolonged struggle from October 2023 to January 2024 to obtain the necessary reasonable accommodation.

345. During this period, Plaintiff Corriere was instructed to stop coming to work and to use his PTO.

346. In December 2023, he was placed on short-term disability in accordance with the LOA policy.

347. This is, yet again, another instance of Defendant forcing disabled employees onto leaves of absence.

348. In January 2024, Defendant agreed to a full-time remote work arrangement from November 11, 2023, to November 11, 2024.

349. In October 2024, he applied for an extension, which was denied.

350. Throughout this process, he used the A-to-Z App to manage his reasonable

THIRD AMENDED COMPLAINT - 39
2:25-cv-00050-JHC

accommodation requests, as required by Defendant Amazon.

351.    Defendant offered noise cancelling headphones as an alternative to working remotely, which was radically insufficient and did not, in any way, accommodate him.

352.    Plaintiff Corriere informed Defendant that the offer was not an appropriate reasonable accommodation extension.

353.    Plaintiff Corriere's doctor's recommendation was that he work remotely 100%.

354.    In early November 2024, Plaintiff Corriere was placed on short-term disability again, despite his doctor recommending against any time off work.

355.    Despite his doctors responding to Defendant's placing Plaintiff Corriere on short term disability, and again requesting that he tried to get a reasonable accommodation, Defendant claimed to never see that he applied for a reasonable accommodation.

356.    Defendant reassigned Plaintiff Corriere while on FMLA to another new team that required in person work and was top secret clearance.

357.    Plaintiff Corriere lives in Las Vegas and was assigned to a team in Virginia. Because he could not connect to the servers remotely, he was reassigned for business needs.

358.    Defendant had Plaintiff Corriere fill out a reasonable accommodation form and a list of jobs he can do.

359.    Defendant responded that he does not meet **any** basic qualifications even though Plaintiff Corriere could do all the jobs listed.

360.    Plaintiff Corriere's resume had everything necessary for the qualifications for each role he sought.

361.    The only 'problem' with Plaintiff Corriere's applications was that he requested remote work as a reasonable accommodation.

THIRD AMENDED COMPLAINT - 40
2:25-cv-00050-JHC

362.     Those hiring managers were aware that Plaintiff Corriere had a reasonable accommodation and has listed Plaintiff Corriere's reasonable accommodation request in his applications.

363.     Plaintiff Corriere was terminated on July 25, 2025, and was only told that he was being terminated because Defendant would not find a way to have him work remotely.

### J.   *Plaintiff Grissom – Third Sub-Class*

364.     Plaintiff Grissom is a disabled woman who worked as a picker for Defendant.

365.     Plaintiff Grissom's job duties included moving, scanning, and managing items in warehouses for proper shipping.

366.     On October 23, 2023, Plaintiff Grissom received an email stating eligibility for permanent hire as she had previously been only a seasonal employee.

367.     Plaintiff Grissom was then employed as full time Picker.

368.     Plaintiff was qualified for her role as evidenced by Defendant observing her performance on a limited work basis and then offering her full-time employment.

369.     In late October 2023, Plaintiff Grissom began experiencing seizure-like symptoms and requested the reasonable accommodation of being kept on the first floor.

370.     Plaintiff Grissom's seizures inhibit major life functions, such as loss of motor control and the potential for fatality.

371.     Onsite managers met this request, but stated that all future reasonable accommodations must be approved through MyHR.

372.     Plaintiff Grissom also spoke with AmCare, Defendant's onsite medical support for workplace injuries, and management several times regarding the symptoms and used all available PTO to avoid unexcused absences.

373.     Plaintiff Grissom experienced seizure activity while working in the first

THIRD AMENDED COMPLAINT - 41
2:25-cv-00050-JHC

department and went home several times as a result.

374. Onsite management and AmCare were notified each time, and Plaintiff Grissom used PTO to cover the missed hours.

375. The symptoms worsened and escalated after Plaintiff Grissom was transferred to the Picker department.

376. Plaintiff Grissom later learned that repeatedly passing under overhead lights at work triggered seizures, as did the stress of constant scanner messages instructing faster work and trying to meet scanner rates as high as 61 items per hour — an unrealistic expectation in a three-level, one-million-square-foot facility like DAL2.

377. On or about November or December 2023, Plaintiff Grissom was written up for a low scanner rate.

378. After explaining the symptoms and requesting a lower rate, the on-duty manager stated that such write-ups were automatically generated by 'the system.'

379. Plaintiff Grissom was informed that any reasonable accommodations must be approved through MyHR and was required to sign the write-up.

380. Plaintiff Grissom did not receive a physical or digital copy of the write up.

381. On December 19, 2023, Plaintiff Grissom passed out on the work floor during a shift, causing the pick cart to fall on top of her.

382. Another employee caught Plaintiff Grissom's arm to prevent a head injury.

383. Plaintiff Grissom went to AmCare alone, where staff did not call 911, but advised going home after determining she had confusion and weakness.

384. Plaintiff Grissom's husband was called to provide transportation home, and an she began making efforts to schedule medical appointments.

385. On December 20, 2023, Plaintiff Grissom attended an appointment at

HARMAN GREEN
824 Exposition Ave., Suite 8
Dallas, Texas 75226

Crossover Health, which is Defendant's employee clinic, with Dr. Aveewan Yun, DO, who referred Plaintiff Grissom to a neurologist and recommended reasonable accommodations if she was allowed to continue working.

386. Dr. Yun stated that she did not believe Defendant would approve reasonable accommodations beyond unpaid medical leave, noting that Defendant "regularly denies medical reasonable accommodations as simple as extra breaks or lower scanner rate quotas."

387. Plaintiff Grissom stated a desire to continue working due to financial need, so Dr. Yun submitted a form requesting reasonable accommodations to allow continued work.

388. On December 23, 2023, Defendant received a reasonable accommodations form from Dr. Yun requesting that Plaintiff Grissom avoid bending, squatting, using step ladders or stairs, driving, or operating heavy machinery.

389. On December 24, 2023, Defendant responded with incorrect employee information, referring to Plaintiff Grissom as "Brittney."

390. Plaintiff Grissom notified Defendant of the error and resent the correct form.

391. On December 25, 2023, Plaintiff Grissom received an email stating that the Unpaid Time-Off ("UPT") balance was negative and responded that reasonable accommodations approval was pending.

392. On December 26, 2023, Plaintiff Grissom received an email stating that reasonable accommodations were denied and that DLS would be notified to continue the leave.

393. As well, Plaintiff Grisson was denied, by MyHR, a transfer request and was told that no alternative reasonable accommodations were available.

394. On December 27, 2023, Plaintiff Grissom received an email instructing her to return to work on the next scheduled day after December 21, 2023.

395. On December 29, 2023, Plaintiff Grissom received and accepted a contingent

THIRD AMENDED COMPLAINT - 43
2:25-cv-00050-JHC

job offer for permanent hire and completed the online steps.

396. That night, due to repeated negative UPT emails and pending leave approval, Plaintiff Grissom returned to work out of fear of losing the permanent hire position.

397. On December 30, 2023, Plaintiff Grissom was informed that medical leave was still active and to remain home until leave approval.

398. Before leaving, Cole from onsite HR confirmed Plaintiff Grissom's name was on the permanent hire list but stated the hiring process would need to wait until return.

399. On January 1, 2024, Plaintiff Grissom received another negative UPT email and responded that a leave extension was still pending approval.

400. On January 2, 2024, Plaintiff Grissom received an email approving leave from December 20 to December 26, 2023, with leave from December 27, 2023, to January 2, 2024, listed as pending.

401. Plaintiff Grissom was sent another email stating her UPT balance was negative, to which Plaintiff Grissom again responded.

402. On January 4, 2024, Plaintiff Grissom received another negative UPT balance email and replied that leave approval was still pending.

403. The same day, an email arrived approving an extension from January 3 to January 17, 2024, stating eligibility only for unpaid medical leave as a reasonable accommodation.

404. Plaintiff Grissom was also asked for medical documentation and resent the reasonable accommodations form while explaining by phone that an appointment with a neurologist was still being scheduled.

405. MyHR extended leave to allow time to find a neurologist.

406. This is yet another example of Amazon's policy of forced LOA.

HARMAN GREEN
824 Exposition Ave., Suite 8
Dallas, Texas 75226

407. On January 13, 2024, Plaintiff Grissom received an email confirming unpaid leave approval from December 20, 2023, to February 22, 2024.

408. On January 16, 2024, Plaintiff Grissom scheduled a neurologist appointment for February 14, 2024, the earliest available date.

409. On February 14, 2024, neurologist Dr. Kishori Somyreddy diagnosed Plaintiff Grissom with seizures.

410. On February 17, 2024, Plaintiff Grissom received emails approving leave from December 20 to December 28, 2023, and from December 30, 2023, to February 22, 2024.

411. On February 19, 2024, Plaintiff Grissom received two emails stating that leave would end on February 22, 2024, and instructing either return to work or an extension.

412. On February 21, 2024, the neurologist sent Defendant a letter extending leave and confirming the seizure diagnosis.

413. Plaintiff Grissom submitted the letter via the A-to-Z app.

414. On February 22, 2024, the leave extension was approved through April 23, 2024.

415. On April 15, 2024, Plaintiff Grissom had a telehealth appointment with the neurologist, who issued a new letter extending leave to May 28, 2024.

416. On April 17, 2024, the leave extension was approved through May 28, 2024.

417. Plaintiff Grissom recalls submitting another progress report toward the end of the leave period, noting no seizures since August 2024 but continued headaches.

418. MyHR requested another progress report by phone, which Plaintiff Grissom submitted via A-to-Z.

419. The neurologist did not issue a release to return to work but instead requested continued leave until the next appointment.

THIRD AMENDED COMPLAINT - 45
2:25-cv-00050-JHC

420. On May 11, 2024, a new leave extension was approved through August 7, 2024.

421. In June 2024, Plaintiff Grissom was notified via mail that employer-provided insurance would terminate in mid-July.

422. When contacted, MyHR stated that Plaintiff Grissom was still classified as seasonal and ineligible for coverage, with no record of the permanent hire offer.

423. MyHR advised that a return-to-work note without reasonable accommodations would be required to reinstate insurance eligibility and that COBRA coverage was available—estimated at approximately $300 per week, which was unaffordable on unpaid leave.

424. On August 2 and 4, 2024, Plaintiff Grissom received additional return-to-work emails.

425. On August 5, 2024, Plaintiff Grissom received an email requesting a medical release from the doctor prior to the August 7, 2024, return date.

426. On August 7, 2024, Plaintiff Grissom's doctor sent a new extension letter through January 13, 2025, given that Defendant was refusing to allow Plaintiff Grissom to have a reasonable accommodation.

427. On August 15, 2024, the neurologist provided a progress report stating Plaintiff Grissom was still unable to work without a reasonable accommodation, and recommended continued leave until January 13, 2025.

428. On August 17, 2024, the leave extension was approved through January 13, 2025, and Plaintiff Grissom was instructed to return to work on the first scheduled day following that date.

429. Months later, Plaintiff Grissom discovered that the A-to-Z App displayed a return-to-work date of January 13, 2025, even though the doctor had never provided medical

THIRD AMENDED COMPLAINT - 46
2:25-cv-00050-JHC

clearance or authorization to return.

430. On January 17, 2025, Plaintiff Grissom returned to work on the first scheduled day after January 13, 2025, due to concerns about job loss.

431. Upon arrival, Plaintiff Grissom's badge did not work, but security permitted entry.

432. Onsite HR expressed uncertainty about employment status, citing the phase-out of seasonal workers.

433. Plaintiff Grissom explained that no termination notice had been received and that a contingent permanent job offer had been accepted months prior.

434. Cole, present at the time, confirmed recalling Plaintiff Grissom's name on the permanent hire list.

435. Plaintiff Grissom was told retraining was required and to return the following night.

436. On January 18–20, 2025, Plaintiff Grissom was retrained on January 18 and resumed regular duties on January 19 and 20.

437. No additional medical documentation was requested, and no reasonable accommodations were offered.

438. Plaintiff Grissom received repeated scanner messages to work faster during both nights.

439. After discussing this with the manager on January 20 and explaining the recent medical leave due to seizures, the manager stated that the messages were automated.

440. Following this conversation, the messages ceased.

441. On January 22, 2025, Plaintiff Grissom received an "end of assignment" email two days after complaining about the scanner messages. The link to the termination letter was

THIRD AMENDED COMPLAINT - 47
2:25-cv-00050-JHC

HARMAN GREEN
824 Exposition Ave., Suite 8
Dallas, Texas 75226

invalid, and Plaintiff Grissom's A-to-Z App account switched to Alumni status, removing access to HR communications and documents.

442. In late January 2025, Plaintiff Grissom contacted MyHR regarding the termination and permanent job offer but was given no answers.

443. Plaintiff Grissom also reported not receiving full pay for the week worked, which was eventually issued at the end of January after multiple calls, messages, and threats of legal action.

444. The actual termination date was January 22, 2025.

445. On May 25, 2025, Plaintiff Grissom unexpectedly received a "Welcome to Your New Work Family" email from Defendant, more than four months after termination.

446. Upon checking Defendant's job portal, Plaintiff Grissom found two completed permanent hire applications listed as "First Day" status, each with the original $17 per hour base pay.

447. Plaintiff Grissom never received any communication regarding start dates or schedules for these applications, which appeared to have been processed during medical leave.

448. In June 2025, Plaintiff Grissom called MyHR and received a document described as a termination letter, which appeared instead to be proof of employment with no stated reason for termination.

449. MyHR instructed Plaintiff Grissom to contact onsite HR for further details.

450. On June 24, 2025, Plaintiff Grissom went to the DAL2 facility.

451. Plaintiff Grissom was not allowed beyond the entrance and spoke with Christian (last name unknown) from onsite HR through a small security window amid loud air conditioning noise.

452. Christian repeatedly stated that the contingent job offer was not a real offer

THIRD AMENDED COMPLAINT - 48
2:25-cv-00050-JHC

and mocked whether the medical leave was "approved or contingently approved."

453.     He confirmed that onsite HR could not contact inactive employees on medical leave unless the employee initiated contact, and that no phone or email contact was available— employees were directed to MyHR for all leave and reasonable accommodation issues.

454.     Christian further stated that employees must still go through MyHR for any reasonable accommodations, even though onsite HR might know what reasonable accommodations are physically possible.

455.     The only way for inactive employees on medical leave to reach onsite HR directly is to appear in person; there is no published phone number or email for contact. Employees are not informed of this and are instead instructed to manage all reasonable accommodation matters through MyHR and the A-to-Z app.

456.     Through subsequent research, Plaintiff Grissom discovered that Defendant's third-party HR system, MyHR, uses an automated process to approve or deny medical reasonable accommodations and that several other employees have reported similar issues.

### K.  *Plaintiff Hodnefield – Second Sub-Class*

457.     Plaintiff Hodnefield has been employed by Defendant since September 11, 2017.

458.     Through a series of promotions and outstanding employment, Plaintiff Hodnefield has been promoted to Software Development Engineer II.

459.     Plaintiff Hodnefield worked remotely during the COVID-19 Pandemic.

460.     On October 22, 2024, Plaintiff Hodnefield first opened a reasonable accommodations request to address his disability of Generalized Anxiety Disorder (GAD).

461.     Plaintiff's GAD inhibits his major life functions, particularly in crowded or noisy environments (such as his in-office reporting site), as Plaintiff Hodnefield's GAD will

THIRD AMENDED COMPLAINT - 49
2:25-cv-00050-JHC

send his nervous system into dysregulation, consuming his mental state and ability to process information or accomplish work tasks.

462. Plaintiff Hodnefield requested a WFH reasonable accommodation to manage the disability.

463. Plaintiff Hodnefield provided medical documentation from a therapist indicating the need for such a reasonable accommodation.

464. On October 23, 2024, Amazon's DLS department sent Plaintiff Hodnefield an automated email confirming receipt of the request and indicating that it was being processed.

465. On, November 5, 2024, DLS emailed Plaintiff Hodnefield, reiterating that the request was being reviewed and provided documentation about medical reasonable accommodations.

466. Plaintiff Hodnefield responded, asking for a timeline on a decision.

467. DLS replied, stating there was no timeline.

468. DLS informed Plaintiff Hodnefield that it was permissible to begin working from home as if the reasonable accommodation had been approved while it was still under adjudication.

469. On November 21, 2024, DLS emailed Plaintiff Hodnefield to ask additional questions about the request.

470. Plaintiff Hodnefield responded with answers to those questions based on his therapist and medical provider's assessments and recommendations.

471. On December 5, 2024, DLS emailed Plaintiff Hodnefield stating that the reasonable accommodation request was 'approved.' The approved reasonable accommodations were a private office (contingent upon availability), low traffic work area, noise-cancelling headphones, additional breaks, and intermittent leave of absence.

472. That same day, Plaintiff Hodnefield corresponded via Slack with a DLS case manager, providing a written explanation as to why the offered reasonable accommodations did not meet the stated needs.

473. The next day, Plaintiff Hodnefield emailed DLS summarizing the conversation from both email and Slack.

474. DLS did not respond.

475. The next month, Plaintiff Hodnefield's manager stated that his manager above him required all employees with pending reasonable accommodation requests to begin working from the office, regardless of prior DLS instructions.

476. Plaintiff Hodnefield's company email automatically deleted the earlier message from DLS stating that working remotely was permitted during adjudication, leaving Plaintiff Hodnefield unable to refute the new directive.

477. On January 16, 2025, DLS emailed Plaintiff Hodnefield to check on how the reasonable accommodations were working but did not acknowledge the previous correspondence.

478. Plaintiff Hodnefield then escalated the matter to a DLS manager, referencing prior communication. After several exchanges, both parties agreed to a trial period to assess the effectiveness of the provided reasonable accommodations.

479. Plaintiff Hodnefield tested the reasonable accommodations for approximately two months.

480. Plaintiff Hodnefield began working in the office five days a week at this time.

481. Nothing about Plaintiff Hodnefield's job responsibilities were any different because of this change – 90% of Plaintiff Hodnefield's work meetings are held virtually and 100% of his job responsibilities can be performed remotely.

THIRD AMENDED COMPLAINT - 51
2:25-cv-00050-JHC

482. On January 22, 2025, DLS ordered noise-cancelling headphones as part of the reasonable accommodation and shipped them to Plaintiff Hodnefield.

483. DLS also opened a ticket to request a private office for Plaintiff Hodnefield.

484. On February 10, 2025, DLS informed Plaintiff Hodnefield that a private office could not be provided and instead offered to relocate the desk to an area they claimed was low-traffic.

485. Upon inspection, Plaintiff Hodnefield found that the proposed location was effectively identical to the existing workspace and not low-traffic.

486. On March 14, 2025, Plaintiff Hodnefield emailed DLS with all collected data from the reasonable accommodation trial, documenting how the reasonable accommodations were not meeting medical needs, and formally requested an appeal of the decision.

487. On March 21, 2025, DLS offered to order a privacy screen for Plaintiff Hodnefield's work location, an option not previously discussed.

488. Plaintiff Hodnefield declined this offer, as it would not meaningfully alter the workspace.

489. On March 26, 2025, DLS responded to the data provided by Plaintiff Hodnefield, stating that documented productivity concerns were irrelevant and that in-person collaboration was best for Defendant.

490. DLS did not address the documented medical concerns regarding the reasonable accommodations' impact on the disability.

491. Plaintiff Hodnefield reiterated that the needs were not being met.

492. At about this time, Plaintiff Hodnefield's total compensation decreased to $329,000, down from $357,000.

493. On April 7, 2025, Plaintiff Hodnefield replied to DLS requesting that only the

HARMAN GREEN
824 Exposition Ave., Suite 8
Dallas, Texas 75226

medical aspects of the reasonable accommodation's impact be addressed, disregarding productivity concerns.

494. On April 11, 2025, DLS informed Plaintiff Hodnefield that no changes would be made to the reasonable accommodation decision.

495. On May 1, 2025, Plaintiff Hodnefield obtained updated medical documentation from the therapist, incorporating data collected during the trial period.

496. The documentation described how the provided reasonable accommodations failed to improve the condition and, in fact, worsened it.

497. The documentation explicitly stated that working remotely was the medically appropriate reasonable accommodation.

498. This was then sent to Defendant, but no response was generated.

499. On May 22, 2025, Plaintiff Hodnefield emailed DLS requesting an update on the reasonable accommodation.

500. The next day, DLS acknowledged the message and stated that an update would be provided once available.

501. On June 23, 2025, DLS emailed Plaintiff Hodnefield, stating that the reasonable accommodation decision made on December 5, 2024, was final.

502. DLS instructed Plaintiff Hodnefield to either accept or decline the offered reasonable accommodations by June 25, 2025.

503. On June 24, 2025, Plaintiff Hodnefield responded to DLS requesting an appeal, reiterating that the needs were not being met and citing the therapist's guidance and a history of successful remote work performance.

504. Plaintiff Hodnefield's manager also replied to DLS, affirming that Plaintiff Hodnefield had been an effective team member both individually and as a mentor.

HARMAN GREEN
824 Exposition Ave., Suite 8
Dallas, Texas 75226

505. DLS did not respond to these messages.

506. On July 2, 2025, DLS emailed Plaintiff Hodnefield, stating that a "Preferential Denial" of the reasonable accommodation had been chosen and that the case would be closed. The message read:

507. "I'm writing to confirm that you have chosen to decline the reasonable accommodations approved for you. I have updated your case status as: Preferential Denial. I will now close your case and the temporary approval you had to work remotely while this decision was pending is no longer valid. You will now need to meet in-office expectations."

508. Plaintiff Hodnefield responded, clarifying that the reasonable accommodation had not been declined and that an appeal had been requested.

509. On July 7, 2025, DLS replied with the following statement: "By not providing a definitive answer of yes or no is an actual declination of the approved reasonable accommodations. All of your documentation has been reviewed that you have provided. You will now need to meet in-office expectations."

510. Plaintiff Hodnefield had already been meeting in-office expectations since January 2025 and continues to do so out of fear of losing his job.

511. The reasonable accommodation case was officially closed despite Plaintiff Hodnefield not being accommodated.

512. Plaintiff Hodnefield has had no further correspondence with DLS since that time.

513. Plaintiff Hodnefield's medical status and disability has worsened as a result of the failure to accommodate.

514. Defendant did not meaningfully respond to Plaintiff Hodnefield's submitted medical information or analysis of proposed reasonable accommodations.

HARMAN GREEN
824 Exposition Ave., Suite 8
Dallas, Texas 75226

515. Defendant refused to consider alternative reasonable accommodations for Plaintiff Hodnefield.

### L. *Plaintiff Holland – Second Sub-Class*

516. On March 9, 2020 Plaintiff Holland was hired as a full-time, salaried employee as a 3rd Party Security Analyst, L4.

517. On March 12, 2020, Plaintiff Holland began fully remote work.

518. On November 28, 2020, Plaintiff Holland received a merit base increase to $90,000.00.

519. On December 30, 2020, Plaintiff Holland was promoted and received a job code change to Risk Management II, L5

520. On October 16, 2021, Plaintiff Holland received a merit increase to $110,000.00.

521. On October 29, 2022, Plaintiff Holland received a merit increase to $113,300.00.

522. On July 8, 2023, Plaintiff Holland received a merit increase to $117,900.00.

523. On April 13, 2024, Plaintiff Holland received a merit increase to $121,500.00.

524. On January 1, 2025, Plaintiff's Projected Total Compensation was $160,092.

525. Stated differently, Plaintiff Holland has been and continues to be qualified for her role while in her remote work arrangement as evidenced by her continued strong performance.

526. On June 24, 2025, Plaintiff Holland received official notification of the employer's RTO mandate, effective September 8, 2025.

527. Prior to this, Plaintiff Holland had been working completely remotely, and it was not an essential job function to work in an office or on site anywhere.

THIRD AMENDED COMPLAINT - 55
2:25-cv-00050-JHC

528. Her providers have stated and continue to state that a fully remote work arrangement is the "only effective accommodation to mitigate" her PTSD, ADHD, and GAD.

529. Environments characterized by unpredictable noise, frequent movements, and other forms of sensory overstimulation — such as Amazon's office spaces — can trigger intense physiological stress responses including elevated heart rate, muscle tension, and dizziness.

530. To prevent escalation and ensure medical safety, these symptoms require immediate regulation in a stable and controlled environment.

531. Naturally, these triggers would severely impair her ability to efficiently perform her job duties like reading, writing, concentrating, and completing tasks.

532. On July 2, 2025, Plaintiff Holland submitted a reasonable accommodation request with medical documentation disclosing her disability, along with a hybrid work schedule recommendation (80% remote, 20% in-office) completed by a healthcare provider (see attachment).

533. On July 22, 2025, Plaintiff Holland held a virtual meeting with an HR representative.

534. Plaintiff Holland was informed that, pursuant to Amazon's corporatewide, non-regional policies, no appeal process was offered, and that the employer was not issuing remote work reasonable accommodations, citing a company-wide push for RTO.

535. Concerns and suggested strategies to support medical needs were discussed.

536. Plaintiff Holland received a denial notice and the following alternative reasonable accommodations to be accepted by July 31, 2025, or they would be forfeited, including participation in a wellness coaching program, noise-canceling headphones, an assigned desk in a low-traffic area, and a phased ramp-up to full-time in-office work over five months.

HARMAN GREEN
824 Exposition Ave., Suite 8
Dallas, Texas 75226

537. On July 28, 2025, Plaintiff Holland sent an email requesting the reason for denial and clarity on remote work exceptions versus ADA reasonable accommodation suitability.

538. On July 30, 2025, Plaintiff Holland received a response from DLS reminding of the approaching July 31st deadline.

539. On July 31, 2025, Plaintiff Holland emailed a conditional acceptance to the alternative reasonable accommodations solely for the purpose of preserving her employment, as no medical provider had approved of, or recommended, the alternative reasonable accommodations.

540. On November 7, 2025, Plaintiff Holland submitted a new accommodations request with a thorough letter from her provider explaining the need for reasonable remote work accommodation, and submitting all necessary documents

541. Before the interactive process could commence, the case was closed with the explanation "employee at work."

542. Instead, Amazon decided to force her out with an "approved" medical leave the following day.

543. When in response to this malicious leave Plaintiff Holland asked for them to review her accommodations request, she was informed that she needed to attempt all in-office accommodations before new ones could be provided.

544. On December 3, 2025, a case manager replied to her stating that the "practice of allowing remote work from home while your request is under review is not an option. If your situation changes and you need to take time off due to your health condition while your accommodation request is pending a decision, reply to this email so that we can support you in navigating time off and leave options."

THIRD AMENDED COMPLAINT - 57
2:25-cv-00050-JHC

545. After filing an ethics complaint, her case was reopened and she was allowed to submit medical documentation with an approved remote work accommodation while her case was pending.

546. She successfully completed her duties, further indicating that in-office presence is not an essential job function.

547. By March 2026, Amazon denied her reasonable remote work request, and gave her the ultimatum to either return to office, or invoke her paid time off.

548. She has since invoked her paid time off, not because she is unable to work, but to avoid any disciplinary infractions as a result of Defendant's refusal to accommodate.

549. Plaintiff Holland has not been accommodated to date.

### M. *Plaintiff Ly –Second Sub-Class*

550. Plaintiff Ly is a Senior Product manager for Defendant and has been employed by Defendant for the last six years.

551. On October 23, 2023, Plaintiff Ly submitted a reasonable accommodation request for partial remote work (three days remote, two in the office).

552. On November 13, 2023, Defendant approved Plaintiff Ly for full remote (five days) through October 31, 2024.

553. On November 20, 2024, Plaintiff Ly requested a second reasonable accommodation for partial remote (three days remote, two in the office).

554. On February 19, 2025, Plaintiff Ly's reasonable accommodation request was "approved" for intermittent remote based on flare-ups.

555. This was not, however, an actual reasonable accommodation.

556. The expectation was for Plaintiff Ly to be in the office five days a week for at least four hours a day.

THIRD AMENDED COMPLAINT - 58
2:25-cv-00050-JHC

557. Defendant also assigned Plaintiff Ly a private office.

558. Remote work based on flare-ups did not align with Plaintiff Ly's diagnosis and needs.

559. Plaintiff Ly has ADHD that must be carefully managed to function at a reasonable level without negatively impacting overall well-being.

560. The reasonable accommodation process was stressful, and it did not appear that the individual assigned to Plaintiff Ly's case was reading or comprehending the responses she provided because that assigned person was not localized. Defendant's use of a corporatewide, nationalized policy to rely on the A-to-Z App, and to Return to Office, did not allow meaningful conversations about what reasonable accommodations Plaintiff Ly needed.

561. Plaintiff Ly was required to repeat information several times, and the assigned representative asked questions already answered in the documentation previously provided by Plaintiff Ly's medical provider.

562. The process did not feel interactive, but, rather, was simply drawn out in an effort to dissuade Plaintiff Ly from obtaining and utilizing her reasonable accommodation to work remotely, something that Amazon's RTO policy would not allow.

563. Defendant made Plaintiff Ly feel pressured to accept the offer as presented, and did not meaningfully have a conversation about what reasonable accommodations were possible.

564. It was not an essential function of Plaintiff's job that she report in person, but Defendant refused to offer a full remote work reasonable accommodation.

565. Defendant imposed a deadline for acceptance, stating that failure to respond by that date would be treated as a rejection.

566. Defendant did not provide an explanation as to why full remote work was no

THIRD AMENDED COMPLAINT - 59
2:25-cv-00050-JHC

longer permitted and failed to acknowledge Plaintiff Ly's concerns about how working in the office triggers sensory overstimulation, even when assigned a private office, due to smells and sounds in common areas.

567. Plaintiff Ly's manager supported the need for her to work remotely.

568. Plaintiff Ly's annual rating for 2024 was "exceeded expectations" (compared to "meets expectations" in 2023), which Plaintiff Ly believes was due to the fact that the Defendant had allowed work in an environment that accommodated Plaintiff Ly's needs and supported success.

569. Plaintiff repeatedly submitted a medical reasonable accommodation request to Defendant via the A-to-Z App only for Defendant to either lose, or completely ignore, that medical information.

570. In any event, it was clear that Defendant did not rely on that medical information when considering Plaintiff's requests for reasonable accommodation and remote employment.

571. Plaintiff works at the Day 1 (SEA41) location, in Seattle, WA and currently works five days per week in the office and is required to report in for at least four hours per day.

### N. *Plaintiff Ottenweller – Third Sub-Class*

572. Plaintiff Ottenweller is a man who is disabled, and requires reasonable accommodations in the workplace.

573. Plaintiff Ottenweller began his employment with Defendant in 2022 as a Picker at a warehouse in Grapevine, Texas.

574. During his employment, Plaintiff Ottenweller was in an abusive domestic relationship.

575. On October 13, 2022, Plaintiff Ottenweller received a letter from his doctor

HARMAN GREEN
824 Exposition Ave., Suite 8
Dallas, Texas 75226

that stated that Plaintiff Ottenweller required a reasonable accommodation.

576. Specifically, the note stated that Plaintiff Ottenweller "will need to be able to wear ear buds at work to listen to music as a coping skill for the symptoms related to his mental illness."

577. Plaintiff Ottenweller was depressed because of his abusive relationship, a relationship where his partner routinely tried to have Plaintiff Ottenweller commit suicide so she could collect on life insurance.

578. Plaintiff Ottenweller asked to be accommodated and was accommodated by Defendant's HR Department.

579. Plaintiff Ottenweller's direct managers, by Alex Ernst and Eric Johnston, were aware of Plaintiff Ottenweller's mental health disability.

580. Plaintiff Ottenweller's direct managers were aware of Plaintiff Ottenweller's reasonable accommodation request to wear ear buds in the workplace.

581. Plaintiff Ottenweller's direct managers harassed Plaintiff Ottenweller because of his disabilities, and routinely made fun of Plaintiff Ottenweller for requiring a reasonable accommodation.

582. Plaintiff Ottenweller's managers created a hostile work environment for two years to attempt to get Plaintiff Ottenweller to quit.

583. Managers pointed speakers at Plaintiff Ottenweller, and blared music all day long in an effort to distract him and to harass him.

584. Plaintiff Ottenweller's managers denied and mocked his mental health condition, specifically to make working conditions intolerable for Plaintiff Ottenweller.

585. Plaintiff Ottenweller's managers explicitly told him that they believed he was "making up" his disability.

THIRD AMENDED COMPLAINT - 61
2:25-cv-00050-JHC

586. Because Plaintiff Ottenweller was disabled, his managers refused to allow him to attend meetings with coworkers and stifled Plaintiff Ottenweller's ability to seek promotions.

587. These negative and harassing acts were done only to distress Plaintiff Ottenweller as a person with disabilities and approved reasonable accommodations.

588. Plaintiff Ottenweller asked for the harassment to stop, but it never did.

589. Plaintiff Ottenweller became homeless and slept in his car in the parking lot, as do many pickers.

590. Upon information and belief, it was well known that many pickers slept in their cars between shifts.

591. Plaintiff Ottenweller was then hospitalized again, in January 2024, as a result of his disability.

592. Plaintiff Ottenweller was hospitalized after sustaining a broken rib at work.

593. Plaintiff Ottenweller left the workplace the same day that he was injured, and had to rely on Defendant's A to Z App to seek time off for the injury.

594. When he was hospitalized again, Plaintiff Ottenweller was terminated immediately.

595. Defendant's policy is to have employees submit information after missing a shift as to why that shift was not completed.

596. Before Plaintiff Ottenweller could submit his information, he was terminated. Plaintiff Ottenweller's termination, then, arose solely out of the failures within Defendant's A to Z App.

### O. *Shannon Pelkie-Therialut – First and Second Sub-class*

597. On September 18, 2021, Plaintiff Pelkie-Theriault signed her offer with

HARMAN GREEN
824 Exposition Ave., Suite 8
Dallas, Texas 75226

approved virtual status coded to Arlington, VA.

598. Plaintiff Pelkie-Theriault suffers from degenerative disc disease, pelvic floor dysfunction, and degenerative defecation.

599. The degenerative disc disease has caused her chronic hip and back pain that limits her mobility, a major life function.

600. Both the pelvic floor dysfunction and degenerative defecation require Plaintiff Pelkie-Theriault to be in close proximity to a bathroom at any given time to avoid soiling herself, as she is not able to properly relax or coordinate her pelvic floor muscles.

601. At this time, Amazon was aware Plaintiff Pelkie-Theriault lived in New Hampshire and confirmed the arrangement was acceptable until Spring 2022.

602. On or about December 2021, in an email chain, Plaintiff Pelkie-Theriault's manager Kelly McFarren confirmed that they would code her to New Hampshire as permanent virtual employee to correct the tax issue, and reassured Plaintiff Pelkie-Theriault there would be no relocation concerns.

603. On or about May 2023, Plaintiff Pelkie-Theriault submitted a temporary request to remain virtual through September 2023 on suggestion of manager Hashmi Syed Nadeem, which was approved by Katie Scott.

604. On or about May 2023, Amazon began to push for a three-day RTO nationwide mandate, and her team began discussing hybrid attendance.

605. From May to August, Plaintiff Pelkie-Theriault attempted several times to discuss this mandate with her bosses, who consistently blew her off.

606. In August 2023, Plaintiff Pelkie-Theriault attended an in-person summit hosted by Amazon, where Ms. Scott held an "Ask Me Anything" stating that Amazon's RTO mandate meant Amazon expected their employees to be in office at least three days a week,

THIRD AMENDED COMPLAINT - 63
2:25-cv-00050-JHC

with those not near a hub being required to move.

607. During this "Ask Me Anything," Ms. Scott stated that anyone who was remote would no longer be considered for promotion.

608. Plaintiff Pelkie-Theriault was finally able to confer with her managers and agreed to relocate to Seattle within one year.

609. On or about October 2023, Plaintiff Pelkie-Theriault's husband was hospitalized in the ICU for 5 days. As a result, she took time off and expressed to management about her anxiety relocating.

610. Plaintiff Pelkie-Theriault's manager, Cara Cashman advised considering a remote accommodation closer to relocation deadline."

611. On March 1, 2024, Plaintiff Pelkie-Theriault underwent bariatric surgery due to fatigue, diabetes, weight, and IBS issues impacting travel and office attendance.

612. On June 19, 2024, per Ms. Cashman's suggestion, Plaintiff Pelkie-Theriault applied for a reasonable remote work accommodation to remain in New Hampshire.

613. On July 2, 2024, before the RTO policy went into effect, Amazon approved the reasonable remote work accommodation through June 19, 2025.

614. Later in July, Ms. Cashman advised Plaintiff Pelkie-Theriault that recertification would be required in June 2025, but it would be a simple process.

615. This was backed up by Amazon's DLS, who indicated the strong likelihood that doing so would make her accommodation permanent.

616. Between July 2024 - June 2025, Plaintiff Pelkie-Theriault underwent severe post-surgery weight loss.

617. Throughout the year, her disabilities worsened and she developed intense nerve pain in her tailbone, hip, and inner thigh.

HARMAN GREEN
824 Exposition Ave., Suite 8
Dallas, Texas 75226

618. On June 1, 2025, Plaintiff Pelkie-Theriault discussed these ongoing medical issues with her doctor, who referred her to a new gastroenterologist.

619. Her doctor filled out Amazon's paperwork to extend the accommodation

620. On June 12, her doctor filled out and submitted an extension request for work-from-home so that Plaintiff Pelkie-Theriault could properly address her developing medical issues.

621. Around this time, Plaintiff Pelkie-Theriault received a new manager, Cheree Lewis, who began interrogating the remote members of Plaintiff Pelkie-Theriault's team on why they were remote.

622. Ms. Lewis would turn out to run her team tyrannically, setting dead-set targets on all remote employees, especially those designated virtual because of their job title.

623. On July 21, DLS denied Plaintiff Pelkie-Theriault a remote work accommodation.

624. Instead, they offered alternative accommodations including restroom proximity, breaks, virtual meetings during flares, shift adjustments, and wellness coaching.

625. On July 22, Plaintiff Pelkie-Theriault requested clarification on these accommodations, especially the layout of the office, and explained relocation would require moving 600 miles away, on top of losing access to her team of medical providers upon whom she was increasingly reliant to manage her disabilities.

626. On July 24, consistent with Amazon's obstructive accommodation structure, Plaintiff Pelkie-Theriault's DLS representative stated that she did not know about the office layout and would not until Plaintiff Pelkie-Theriault accepted the accommodations, referring the relocation discussion to Plaintiff Pelkie-Theriault's manager.

627. At this time, pursuant to the implementation of the RTO policy, it was

THIRD AMENDED COMPLAINT - 65
2:25-cv-00050-JHC

Amazon's directive and policy not to engage in the interactive process if an employee was seeking a remote work accommodation.

628. On or about July 2025, the overwhelming stress of the prospect of relocating coupled with her intensifying disabilities forced Plaintiff Pelkie-Theriault to apply for intermittent leave through July 24, 2026.

629. Ms. Cashman assured Plaintiff Pelkie-Theriault that if Amazon were to force her to return in-person, Plaintiff Pelkie-Theriault would not be required to do so until November 1.

630. In an attempt to make Amazon's inadequate accommodations work, Plaintiff Pelkie-Theriault requested additional accommodations including priority parking, private parking, medical storage, implementation guidance, and extension for documentation.

631. Due to the nature of her disabilities, she raised privacy and accessibility concerns about the office layout.

632. On August 1, Ms. Cashman, out of nowhere, presented an ultimatum to Plaintiff Pelkie-Theriault: sign a relocation agreement under threat or being considered a voluntarily resignation by November 1.

633. Upon information and belief, many Second Sub-Class employees were subject to a 'return or resign' ultimatum when seeking a remote accommodation.

634. Plaintiff Pelkie-Theriault had not yet completed her specialist evaluation to determine her fit for relocation and had received additional diagnoses and referrals for pelvic floor physical therapy.

635. Between August - September Ms. Cashman was required to recode Plaintiff to Arlington HQ2 for the DLS team to assign her a desk that met requirements they themselves had offered, causing payroll and tax delays and errors that to this day have yet to be resolved.

THIRD AMENDED COMPLAINT - 66
2:25-cv-00050-JHC

636. Shortly afterward, DLS worker Danielle Roland severed the interactive process.

637. Ms. Roland had been unaware that the only showering facilities in Plaintiff Pelkie-Theriault's office were two elevator rides and a walk away from her current desk.

638. Further, Ms. Roland had promised Plaintiff Pelkie-Theriault a secure location to store any soiled clothing, only for said "secure location" to be a filing cabinet with towels and soap.

639. On August 28, Ms. Roland emailed Plaintiff Pelkie-Theriault that her ramp back date would actually start September 2nd.

640. This avoidable mistake had to be corrected by Plaintiff Pelkie-Theriault and her manager.

641. After this, Ms. Roland stopped responding.

642. Between August - September Ms. Lewis, after Ms. Roland stopped responding, told Plaintiff Pelkie-Theriault that she was not allowed to use accommodation for different working hours because everyone had to work during normal business hours.

643. Plaintiff Pelkie-Theriault notified Ms. Cashman, who refused to do anything about it.

644. Plaintiff Pelkie-Theriault met with her physical therapist, who advised her that she would need physical therapy ("PT") under December.

645. When Plaintiff Pelkie-Theriault notified Ms. Cashman of this medically necessary therapy, Ms. Cashman retorted that Ms. Lewis would never approve it, and re-emphasized their position that not signing the relocation document would be considered a voluntary resignation.

646. On or about September 2025, to regulate her disabilities, Plaintiff Pelkie-

HARMAN GREEN
824 Exposition Ave., Suite 8
Dallas, Texas 75226

Theriault had no choice but to apply for intermittent FMLA to avoid having her PT appointments held against her by Ms. Lewis, who was actively pushing back on appointments from others in Plaintiff Pelkie-Theriault's team.

647. Later in September, Plaintiff Pelkie-Theriault's PCP advised that an additional specialist may be needed if Plaintiff Pelkie-Theriault's nerve pain did not resolve, further requiring Plaintiff Pelkie-Theriault to remain in New Hampshire.

648. On or about October 2025, Plaintiff Pelkie-Theriault began a medication regimen that required she be in direct proximity to a bathroom.

649. So as to not lose her job, Plaintiff Pelkie-Theriault began making plans to fly down weekly to Arlington in November to continue physical therapy at home.

650. All throughout, she communicated to Ms. Cashman her concerns and how Ms. Roland refused to confirm that they were putting her accommodations in place.

651. In late October, every team member Ms. Lewis had questioned in June was laid off.

652. On November 3, while discussing a promotion project, Plaintiff Pelkie-Theriault explained her need to commute weekly between New Hampshire and Virginia for PT until she found a new medical team.

653. Ms. Cashman stated in response that Ms. Lewis would ask why Plaintiff Pelkie-Theriault hadn't handled this before reporting to Arlington, and that Plaintiff Pelkie-Theriault should have taken FMLA since Ms. Lewis wouldn't be interested in me having appointments.

654. Plaintiff Pelkie-Theriault reminded her that she asked to push the RTO to January because of these appointments, and that she had applied for intermittent FMLA because of that.

THIRD AMENDED COMPLAINT - 68
2:25-cv-00050-JHC

655. Plaintiff Pelkie-Theriault, after all the distress caused by Ms. Cashman's passive support for Ms. Lewis' venomous oversight over remote employees, applied for a continuous medical leave.

656. On November 24, Amazon approved leave from November 4, 2025 – February 5, 2026 with paid leave benefits, FMLA leave from November 4, 2025 – January 22, 2026, and short-term disability from November 4 – 21, 2025.

657. On January 26, 2026, Plaintiff Pelkie-Theriault's provider submitted paperwork to extend her leave through March 30.

658. Two days later, Plaintiff Pelkie-Theriault confirmed if DLS had received the paperwork, within ten minutes of which her extension was approved.

659. However, the representative stated "another team" needed to review the pay portion, but "couldn't" provide any insights as to what that process would be.

660. Said representative promised a response from the team within two days of January 30th.

661. When Plaintiff Pelkie-Theriault checked in on February 3rd, DLS stated they had escalated the issue and that Plaintiff Pelkie-Theriault should actually have received a paid benefits update on the 28th. They were unsure why Plaintiff Pelkie-Theriault had not received a response.

662. The following day, Plaintiff Pelkie-Theriault checked in again, and an agent demanded further documentation first with no specifics, and then documentation that had already been received on January 28th.

663. Nonetheless, they demanded authorization for them to speak with Plaintiff Pelkie-Theriault's doctor's office.

664. Plaintiff Pelkie-Theriault stated she felt discriminated against and demanded

HARMAN GREEN
824 Exposition Ave., Suite 8
Dallas, Texas 75226

her case be escalated since she refused to resubmit the same documentation repeatedly.

665.     The representative suddenly found an internal note that Plaintiff Pelkie-Theriault "could be paid for January" and offered a pay date of February 13th, which got changed to February 5th after Plaintiff Pelkie-Theriault directed the representative to her missed pay date of January 30th.

### P.  *Christi Springer – First and Second Sub-class*

666.     Plaintiff Springer had worked for Amazon since 2000 in a decorated 19-year career earning twelve promotions and relocating twice, demonstrating her commitment to Defendant.

667.     In 2019, she took a two year sabbatical to help care for family, and was actively recruited back in September 2021 as a Senior Program Manager salaried at $172,000.

668.     Plaintiff Springer was explicitly rehired remotely, an arrangement approved by then-Senior Vice President of Global Fulfillment and Customer Service Operations Dave Clark.

669.     Plaintiff Springer had worked with a global team who all worked remotely throughout her rehire, providing no justification that in-person presence was required for her position at any time.

670.     Plaintiff Springer suffers from lifelong Generalized Anxiety Disorder and Major Depression, and was diagnosed in 2017 with PTSD as the result of a home invasion.

671.     Any trigger to one of her disabilities will concurrently trigger her other disabilities in the same way, meaning Plaintiff Springer must carefully control her environment to ensure flashbacks and flare-ups are minimized.

672.     Plaintiff Springer's disabilities impair her major life functions in that she must closely monitor her environment since triggers can severely debilitate and exhaust her, thus

THIRD AMENDED COMPLAINT - 70

HARMAN GREEN
824 Exposition Ave., Suite 8
Dallas, Texas 75226

preventing her from being able to accomplish her work or devote needed mental energy to her tasks.

673. Maintaining attention over time and emotional and mental stability are major life functions under the law that is impaired by Plaintiff's disabilities.

674. On or about August 2023, amid growing return-to-office pressure throughout Amazon, Plaintiff Springer applied for and was approved an indefinite reasonable fully remote work accommodation.

675. On or about February 2024, DLS sent Plaintiff Springer a 6-month check-in email asking if accommodation was still needed. Plaintiff Springer confirmed it was, and no further medical documentation was requested.

676. On March 17, 2025, out of nowhere, DLS stated that Plaintiff Springer's accommodation was set to end on March 11, 2025 - 6 days in the past - and instructed Plaintiff Springer to request an extension prior to the end date or her accommodation case would be closed.

677. This flew in the face of her accommodation being indefinite, and Plaintiff Springer immediately phoned DLS for clarification who confirmed that there was no end date to her accommodation and to disregard the erroneous email.

678. On March 27, Plaintiff Springer received another DLS email requesting medical information required by April 3 to recertify her accommodation.

679. Plaintiff Springer again called DLS, who again confirmed it was erroneous and she should disregard the email. She asked if they could escalate the defect since it was causing alarm and undue distress.

680. On April 9, 2025, Plaintiff Springer received a message on Slack from case manager/Senior Accommodation Consultant Linda Hill requesting a phone meeting. Plaintiff

HARMAN GREEN
824 Exposition Ave., Suite 8
Dallas, Texas 75226

Springer agreed, where Ms. Hill informed Plaintiff Springer that Defendant did in fact require additional information and input from her medical provider to recertify her remote work medical accommodation.

681. Plaintiff Springer ensured she explained how this went against Defendant's stated expectations, to which Ms. Hill responded that there had been a change in the policy, and that re-evaluation was required.

682. Plaintiff Springer explained how this experience created confusion and distress that had negative impacts to her health.

683. On April 16, Plaintiff Springer sent a follow up email to Ms. Hill and DLS recapping the conversation and requesting the updated policy.

684. On May 1, Ms. Hill acknowledged the stress and concern that this situation had created, but refused to elaborate on the policy, simply stating that Plaintiff Springer must submit new medical documentation.

685. On May 5, Plaintiff Springer's healthcare provider submitted the requested information to Defendant, who confirmed they received what they needed 11 days later.

686. Between May 26 - May 30, the combined stress of accommodation uncertainty coupled with hostile work environment distressed Plaintiff Springer to the point where she requested a protected leave.

687. Plaintiff Springer requested a protected continuous medical leave from June 2 - August 3, due to distress caused by work.

688. On June 4, Senior Case Manager Rebecca requested medical documentation for the leave by July 4, which Plaintiff Springer provided by June 27.

689. On June 23, while on leave, a new case manager, Shawna Lewis, was assigned to Plaintiff Springer and requested additional information about her disabilities.

THIRD AMENDED COMPLAINT - 72
2:25-cv-00050-JHC

690. On July 1, Plaintiff Springer responded to Ms. Lewis' email, informing her that she was currently on medical leave and her health issues prevented her from responding to the questions.

691. Plaintiff Springer stated she would answer her questions upon returning to work.

692. On July 1, DLS approved the medical leave with paid short-term disability benefits.

693. Ignoring Plaintiff Springer's communications on health restrictions, Ms. Lewis simply re-demanded the information the next day, stating she needed it for the accommodation.

694. On July 17, DLS, in typical fashion, relayed previously stated approval of Plaintiff Springer's medical leave.

695. DLS sent Plaintiff a separate email stating that they received her doctor's medical documentation, which Plaintiff Springer had not submitted, and were opening a medical accommodation case.

696. Being that there was a case already opened and in progress under Ms. Lewis' oversight, Plaintiff was left confused.

697. DLS sent another redundant email requesting supporting medical documentation by August 1, which Plaintiff Springer had already submitted.

698. Plaintiff's disabilities significantly worsened in response to this confusion, as she feared her accommodation once and for all getting denied if she did not follow through.

699. On July 23, DLS denied Plaintiff Springer's remote work accommodation and instead offered an assigned desk, additional breaks, and a HEPA filter. They mandated a ramp back plan that increased required in office days from 9/1 - 10/3, with 7 days to accept.

700. Plaintiff Springer's manager, Sarah Maxwell, replied to the email confirming

HARMAN GREEN
824 Exposition Ave., Suite 8
Dallas, Texas 75226

approved relocation to hubs for Seattle, Arlington, Nashville, declining to provide any further support or information on relocation support available, and ignoring the unrealistic nature of this deadline due to Plaintiff Springer's leave.

701. Ms. Maxwell was fully aware that Plaintiff Springer did not live in proximity to any of the locations, was on medical leave, and that the RTO deadline was unrealistic given Plaintiff Springer's medical leave.

702. On July 24, again in typical fashion, DLS sent Plaintiff Springer redundant and duplicate information on her approved medical and short term disability leave details.

703. On July 30, Plaintiff Springer requested an extension to her disability leave, and communicated her scheduled appointment with her healthcare provider to provide documentation.

704. On July 30, Plaintiff Springer sent Ms. Lewis an email expressing how the conflicting and confusing emails had deteriorated her health, that she did not agree with the decision, and requested to resume the interactive process upon returning to work.

705. Plaintiff Springer also raised to both Ms. Lewis and Rebecca that she had not received timely payment of her short-term disability, creating financial hardship.

706. On August 1, Plaintiff Springer reported a $3,000 shortfall in her most recent payment, and requested an investigation as to why.

707. On August 2, attempting to save face, DLS replied to Plaintiff Springer's email sent to Rebecca that payments June and July would be disbursed together on July 31, contradicting that payout was expected on the last business day of the same month in alignment with salaried pay cycles.

708. Ms. Lewis, acknowledging Plaintiff Springer's medical leave, still demanded Plaintiff Springer respond to Defendant's proposed accommodations.

THIRD AMENDED COMPLAINT - 74
2:25-cv-00050-JHC

709. In response, Plaintiff Springer reminded her that she has been a remote employee since her hire, does not live in proximity to any stated hub location, and cannot deal with work matters until released by his doctor.

710. On August 5, Ms. Lewis replied that Defendant were forcing Plaintiff to "return" to a hub location and notify them of her decision on the accommodation.

711. On August 6, Jose Miguel Hernandez confirmed the disbursement amounts Plaintiff Springer received were accurate and provided pay stubs as attachments.

712. Ironically, this confirmed that the previous amounts provided by DLS were also in error.

713. On August 8, Ms. Lewis noted a preferential denial of the accommodations offered by Defendant and closed the case, informing her she would need to fully be back in the office by September.

714. On August 11, Plaintiff Springer was sent yet another email from DLS with duplicative information approving her medical leave

715. On August 12, Plaintiff Springer extended her leave date to October 6, which DLS approved but denied paid benefits past August 9.

716. Plaintiff Springer, confused and distressed once again by DLS' inconsistencies, requested re-evaluation of extension of short term disability three days later.

717. On August 20, DLS conditioned short-term disability extension on providing burdensome and extremely intrusive medical information including medication regimen and detailed notes from mental status exam findings.

718. Plaintiff Springer's medical provider raised concerns about confidentiality compliance with HIPAA, which Plaintiff Springer communicated in an email stating she will provide new information that has not already been provided.

THIRD AMENDED COMPLAINT - 75
2:25-cv-00050-JHC

719. On August 21, Plaintiff Springer further communicated in her accommodation email chain that Defendant's inadequate accommodations did not reflect her medical providers recommendations, and that they were forced on her during a protected medical leave without a meaningful interactive process as required under the ADA, worsening her disabilities.

720. On August 22, Ms. Lewis informed Plaintiff Springer simply that the case had already been closed and to open a new case when Plaintiff Springer returned to work.

721. On August 25, once again, DLS sent an email with redundant information regarding leave and short-term disability details.

722. On August 26, once again, DLS sent an email that FMLA pay is exhausted and to notify them if Plaintiff Springer needs additional leave.

723. On September 1, once again, DLS sent an email with redundant information regarding leave and short-term disability details.

724. On September 26, Plaintiff emailed DLS with updated medical documentation from her provider, stating further documentation was to come.

725. On September 29, DLS demanded Plaintiff Springer's healthcare provider send a return-to-work release by October 1, noting her slated return on October 2.

726. On October 1, a leave representative called Plaintiff Springer to inform her they had received no documentation or emails regarding medical leave extension. Plaintiff Springer notified the case manager that she had sent multiple emails.

727. During the 40-minute call, Plaintiff Springer forwarded and sent information to the required DLS email alias multiple times, only for the case manager to state the emails were not received. Ultimately, Plaintiff Springer had to send the email to her personal work email address, and only then was it received by the A-to-Z App.

728. Plaintiff Springer requested DLS escalate this issue as their primary method

HARMAN GREEN
824 Exposition Ave., Suite 8
Dallas, Texas 75226

of communication with employees was clearly faulty. During this call her leave was extended until December 2 and his short-term disability through November 30, 2025.

729. On October 1, once again, DLS sent Plaintiff Springer two additional emails from DLS confirming the new return to work and short-term disability approval dates.

730. On October 8, Rebecca informed Plaintiff that there was a known issue with email feeds not showing up in the DLS system and that they had escalated the technical issue with the email feeds.

731. She also noted that the "old system" was reviewed and did show her emails, and she hoped this issue would not happen again.

732. On October 14, The Hartford Group called Plaintiff Springer informing her that a packet regarding her long-term disability referral will be mailed soon.

733. On October 28, Defendant role-eliminated Plaintiff as pretext for a discriminatory termination Information was included on how to utilize the Defendant's A-to-Z App and how to reach out to with questions and concerns.

734. Between October 28-29, "Kenny" from HR called twice in regards to the announcement of the changes in which Plaintiff Springer should have received notification on October 28. He advised questions should be directed to the Defendant A-to-Z App to reach Defendant HR with any questions.

735. Plaintiff Springer believes this voice recording sounded like an AI voice.

736. On November 28, DLS sent Plaintiff Springer a text message and email stating that they looked "forward to your upcoming return to work and would like to welcome you back."

737. While able to deliver the utmost for their customer, Defendant clearly could not be bothered to provide their employees the same courtesy.

HARMAN GREEN
824 Exposition Ave., Suite 8
Dallas, Texas 75226

738. On November 28, Plaintiff Springer informed DLS of the return-to-work emails and texts, emphasizing how inappropriate they were considering Defendant role-eliminated her a month prior.

739. Once again, Plaintiff Springer requested this technical issue be escalated.

740. Plaintiff Springer also mentioned she was again short $3,000 of pay for November.

741. A representative with Defendant informed her they would escalate and that per the FAQ any portion of the non-working period that was under leave of absence would be included in the final severance package payment in January.

742. In February, Defendant issued Plaintiff Springer a severance package, whose attempts to negotiate through counsel have gone thoroughly ignored.

### Q. *William Stellmon – First and Third Sub-class*

743. Plaintiff Stellmon was a Warehouse Associate at Defendant's GEG1 site in Spokane, Washington at $23.75/hour starting September 2022.

744. On or about December 2024, Plaintiff Stellmon developed a repetitive motion wrist injury at GEG1, which after extended or repeated use causes immense pain and permanent ligament and muscle damage.

745. Plaintiff Stellmon's major life functions are impaired as he has limited ability to use his wrist due to the injury.

746. Although Plaintiff Stellmon attempted to manage the pain with wrist wraps, the pain intensified severely over the coming months.

747. Plaintiff Stellmon continued to work diligently, attempting to working through the pain in order to honor his job duties.

748. On May 22, 2025, 5 months after the onset of injury, his wrist became so

THIRD AMENDED COMPLAINT - 78
2:25-cv-00050-JHC

inflamed and unbearably painful that Plaintiff Stellmon had to rest by using vacation/UPT to manage symptoms.

749. Between May 23-24, the pain became too extreme to work, and he accrued about 8 hours of unpaid time off ("UPT") penalties, marking his first UPT penalty accrual at Amazon.

750. On May 25, Plaintiff Stellmon went to urgent care, who referred him to a specialist and provided a note for an accommodation with a sling to limit use of his wrist as necessary.

751. On May 26, Amazon rejected the note as vague and demanded the doctor fill out their own L&I form.

752. Amazon then applied UPT penalties without engaging in any interactive dialogue about accommodations, failing to assess his sling request while refusing to demonstrate any undue hardship.

753. On May 27, Plaintiff Stellmon stayed home to avoid further injury from duties, incurring another UPT penalty (10h exceeded) and creating a double negative UPT balance.

754. Plaintiff Stellmon opened an FMLA leave request to categorize his absences May 23-29 as protected medical leaves.

755. On May 29, the following day, Plaintiff Stellmon had an X-ray of his wrist performed, confirming it was a mild degenerative disease and possible old injury, supporting ongoing work-related aggravation.

756. On May 30, Plaintiff Stellmon timely submitted an accommodation request and follow-up appointment documents.

757. On June 3, 4, 5, 7, 12, 14, 19, & 20, Plaintiff Stellmon had to take absences to manage his pain, leading to 30 hours of UPT penalties that sent his UPT balance into the

THIRD AMENDED COMPLAINT - 79
2:25-cv-00050-JHC

negative without leave approval.

758. On or about late June, Amazon claimed that the document submission, and by proxy his accommodations, had expired, and that Amazon was expecting him to return to work in less than 24 hours despite his doctor's recommendation that he do not work.

759. Amazon applied ten-hour UPT penalties for related absences.

760. On June 30, Amazon denied Plaintiff Stellmon's intermittent leave for "insufficient documentation," despite his more-than-sufficient documentation detailing what the disability was and its effects.

761. On July 1, Plaintiff Stellmon requested another intermittent leave be approved between May 1 – August 8 to manage his disability.

762. Between July 9-11, Plaintiff Stellmon had to take absences to manage his pain, leading to 30 more hours of UPT penalties that continued to deplete his already negative balance without leave approval.

763. Plaintiff Stellmon submitted additional supporting documents the following day, but did not receive any acknowledgement by DLS of receipt.

764. On July 14, DLS emailed Plaintiff Stellmon stating his leave request remained pending due to "incomplete documentation", specifically lacking frequency or duration details and signed certification.

765. On July 16, Plaintiff Stellmon's leave claim continued to remain pending, but Amazon required him again to attempt job functions despite email inquiry, providing no response.

766. Plaintiff Stellmon responded "The healthcare provider is awaiting a scan that is not available until August. How am I supposed to work or remain on light duty? I really feel like no one is examining anything I submit. I am struggling with pain management."

HARMAN GREEN
824 Exposition Ave., Suite 8
Dallas, Texas 75226

767. On July 19, Plaintiff Stellmon's accommodation request was left pending, with documentation requested by July 31 despite his earlier submissions.

768. On July 22, Amazon approved an unsolicited — meaning unrequested — continuous leave between July 30 and August 25, but disability benefits were left pending due to, once again, "insufficient documentation", with Amazon repeating demands for already-provided materials.

769. Amazon further stated to Plaintiff Stellman that he had "failed to provide documentation supporting you have a disability."

770. Refusing to allow DLS to steamroll his reasonable intermittent leave request, Stellmon opted to continue working.

771. On August 1, DLS closed Plaintiff Stellmon's accommodation case for "lack of documentation" while his leave was pending.

772. Over the next 3 days, DLS sent Plaintiff Stellmon this same email eight times without explanation.

773. On August 4, DLS canceled their unsolicited leave since Stellmon was working.

774. On August 7, Amazon sent Plaintiff Stellmon a message to "check in" about his negative UPT balance, wholly ignoring his several accommodations requests and requested leaves.

775. Four days later, Amazon sent Plaintiff Stellmon several exceeded UPT durations from May-August, once again wholly ignoring his several reasonable accommodation and leave requests.

776. Plaintiff Stellmon responded seeking clarification with "What do you need from me?".

THIRD AMENDED COMPLAINT - 81
2:25-cv-00050-JHC

777. On August 13, DLS sent Plaintiff Stellmon a Healthcare Provider form for physician completion, despite several prior submissions of the same document.

778. On August 20, DLS denied Plaintiff Stellmon's intermittent leave for the second time for "incomplete FMLA documentation" lacking the frequency or duration of the injury, and further expected his return by August 25.

779. On August 26, Plaintiff Stellmon underwent a nerve test that confirmed nerve damage resulting from the injury, and communicated this to Amazon.

780. On September 25, Amazon stated that urgent contact was needed with DLS regarding his leave request, noting that his unapproved absences were subject to their attendance policy and requesting further missed time information.

781. Plaintiff Stellmon responded offering to provide medical documentation for absences, much as he had before.

782. On September 26, Amazon's People, eXperience, and Technology Departures Interventions team issued an urgent notice of negative UPT balance violating attendance policy, requiring 48-hour response with absence details under threat of employment status review if no reply.

783. On September 29, Stellmon sent a second response, stating "So I am being deducted 30 hours of upt from the first week of injury. I had a doctor's note for accommodations. However, it was rejected and I was told I would be required to preform my job functions. It's been months and I am kept up at night due to the pain. I am going to call L&I to try to get this sorted out. My wrist would have had the same restrictions it did when I was seen by orthopedic care. So I am honestly lost why that [chunk] of absence has been a compensated. Will be setting up a meeting with an attorney. I have submitted all documents to you."

784. Amazon notified Plaintiff Stellmon afterward that their negative UPT balance

HARMAN GREEN
824 Exposition Ave., Suite 8
Dallas, Texas 75226

case was closed without resolution and directed him to the A-to-Z App "Contact Support" for HR, closing the channel prematurely amid ongoing disputes.

785. On October 7, Amazon's AET Interventions replied to Plaintiff Stellmon's September 29 with a curt two-sentence email, stating they were "working with site HR to check coverage" and to "continue to work with the DLS team."

786. On October 7, Plaintiff Stellmon responded to the UPT notice, detailing he was "Tired of being ignored and the bad fatih [sic] communication," and laid out several legal codes that Amazon had violated throughout his experience attempting to be accommodated for a simple wrist injury.

787. That same day, Plaintiff Stellmon sent follow-up response expressing frustration with ignored communications and bad faith, detailing non-compliance with L&I Claim BJ52880 leading to 100 hours negative UPT risking termination by October 9:

788. On October 14, Plaintiff Stellmon underwent an MRI of his right wrist, which confirmed severe injury.

789. Before Plaintiff Stellmon could report this, Amazon terminated him, claiming his negative UPT balance was excessive as pretext for failure to accommodate.

790. On October 15, Plaintiff Stellmon attempted to appeal his termination, citing policy inconsistencies and injury-related absences.

791. In attempting to appeal via the A-to-Z App, it became unsecured, requiring mobile web desktop secure sign-in for PII/pay/banking changes, hindering navigation and appeal presentation.

792. On October 20, Amazon denied his appeal without hearing, marking it "Undefined," amid A-to-Z App system issues blocking Stellmon's desktop login for appeal uploads.

HARMAN GREEN
824 Exposition Ave., Suite 8
Dallas, Texas 75226

### R. Eleazar Zwillinger – Second Sub-Class

793. Plaintiff Zwillinger was hired by Defendant in September 2021 as a Systems Development Engineer salaried at $140,000.

794. Plaintiff Zwillinger is disabled and must consistently manage his Generalized Anxiety Disorder and ADHD, meaning that his mental health, executive cognitive function, and sensory processing are prone to overstimulation or influence by external stimuli.

795. This is especially true in public spaces, where his anxiety is heightened and regulating it demands significant mental energy he would otherwise put toward concentrating on or completing whatever task is before him.

796. On October 23, 2024, Plaintiff Zwillinger opened a case with Defendant's HR for permanent remote work accommodation.

797. Between October 2024 to December 2025, Defendant shuffled Plaintiff Zwillinger through at least three accommodation consultants who did not make progress on his case.

798. On or about January 2025, DLS consultant Shawn Laubscher was assigned to Plaintiff Zwillinger's case, where he held an off the record call admitting that he could grant Plaintiff Zwillinger a one-year accommodation that would be denied since there was pressure to deny accommodations.

799. Mr. Laubscher also provided to Plaintiff Zwillinger that per his rights, he could demand to be evaluated for a permanent accommodation as Plaintiff Zwillinger requested. However, Mr. Laubscher clarified he would have to forward that request to Mr. Laubscher's bosses who would then deny it because there was pressure to deny accommodations.

800. Mr. Laubscher indicated that he was holding the call with Zwillinger because he could not put this information in formal written communications without reprimand.

THIRD AMENDED COMPLAINT - 84
2:25-cv-00050-JHC

801. Plaintiff Zwillinger accepted the one year medical accommodation, which was approved on January 31 for the period between January 6, 2025, to January 6, 2026.

802. On December 15, Plaintiff Zwillinger's manager, Zeljko Mitrovic, told Plaintiff Zwillinger that DLS reached out to him advising that Plaintiff Zwillinger submitted an accommodation request.

803. Plaintiff Zwillinger had not yet done so.

804. On December 19, Plaintiff Zwillinger received two emails from Mr. Laubscher and DLS advising that his accommodation was expiring on "[insert due date]" and January 6, 2026, respectively.

805. Three days later Mr. Mitrovic clarified with Plaintiff Zwillinger whether he submitted an accommodation request but advised that he responded indicating that Plaintiff Zwillinger was absolutely capable of doing his job remotely.

806. On January 5, 2026, Plaintiff Zwillinger met with his healthcare provider and attached a letter written by them to DLS's most recent email stating how his disabilities affect him, that Defendant's previously approved accommodations were inadequate, and that an in-office environment exacerbates his anxiety.

807. He attempted to attach this document to the MyHR case, whose interface consistently rejected it.

808. An automated chatbot informed Plaintiff Zwillinger that he had to create a new case using a nonexistent "Create a New Case" button, leaving Plaintiff Zwillinger no recourse to do so.

809. Plaintiff Zwillinger then started a live chat with Defendant's HR who told him that responding to the email was sufficient. Mr. Laubscher followed up shortly afterward stating that Plaintiff Zwillinger's attached document did not show up in the backend, and instructed

HARMAN GREEN
824 Exposition Ave., Suite 8
Dallas, Texas 75226

Plaintiff Zwillinger to upload it to A-to-Z, which he did.

810. On January 6, 2026, Mr. Laubscher responded that the letter does not have a signature from the provider, after which Plaintiff Zwillinger uploaded a signed letter to A-to-Z.

811. On January 7, 2026, Mr. Laubscher followed up asking for details about his support animal, which Plaintiff Zwillinger timely responded is a cat and was not a part of his accommodation request.

812. On January 8, 2026, Defendant calls Plaintiff Zwillinger's health care provider and asks her to verify that the documents came from her and were not forgeries, which she does.

813. On January 12, 2026, DLS denied Plaintiff Zwillinger a remote work accommodation and the nonrequested cat on site. Defendant offered him instead a desk in low traffic area, wellness coaching, noise cancelling headphones, and a ramp back plan with 7 days to make a decision.

814. Plaintiff Zwillinger responded stating explicitly he would like to continue the interactive process to find a better solution.

815. On January 14, 2026, Mr. Laubscher replied that the interactive process is ongoing, but Plaintiff Zwillinger must accept or decline the approved accommodations by January 19, 2026.

816. On January 15, 2026, Plaintiff Zwillinger replied that he was not rejecting accommodations, but that he will timely have his healthcare provider draft a letter explaining why Defendant's offered accommodations are insufficient

817. On January 16, DLS extended the deadline to January 22, and indicated adjustments can be made after Plaintiff Zwillinger accepted them

818. On January 20, Plaintiff Zwillinger met with his provider, who drafted a letter stating that "the accommodations that have been offered are not sufficient for his needs."

HARMAN GREEN
824 Exposition Ave., Suite 8
Dallas, Texas 75226

819. After several emailing issues to A-to-Z similar to his experience on January 5, Plaintiff Zwillinger emailed this new letter to DLS.

820. On January 23, Defendant responded that "the medical documentation you have submitted describes the same limitations as your previous medical documentation" and states he must make a decision by January 27.

821. On January 27, Defendant reminded him to accept or decline the offered accommodations.

822. Defendant closed Plaintiff Zwillinger's accommodation case for nonparticipation since Plaintiff Zwillinger did not accept the offered accommodations.

823. On March 3, Defendant ostensibly role-eliminated Plaintiff Zwillinger to cover for their refusal to reasonably accommodate him.

## V. CLASS ALLEGATIONS

824. Upon information and belief, Defendant employs 1.5 million of people across the United States. If even one percent of them are disabled, that would make 150,000 Amazon employees disabled.

825. Employees utilize the A-to-Z App to process things like time off, disability reasonable accommodation requests, and other human resources functions.

826. First Sub-Class encompasses all employees have sought a reasonable accommodation request through the A-to-Z App.

827. Like Plaintiffs, Class Members who submit a reasonable accommodation are routinely treated as an afterthought and are forgotten about.

828. Defendant's decentralized human resources model does not allow for appropriate conversations about the Class Member's disabilities.

829. Defendant's website identifies a team of "Reasonable accommodation

HARMAN GREEN
824 Exposition Ave., Suite 8
Dallas, Texas 75226

Consultants" who provide "reasonable accommodation support to our associates."

830. These Reasonable accommodation Consultants rarely, if ever, maintain current or reliable files on employees, evidence by Plaintiff having to constantly resubmit medical forms that had already been provided.

831. The A-to-Z App does not use regional or localized human resources employees to communicate with disabled employees, nor do employee's regional or localized managers or job functions make any impact on the ability to communicate with them about their reasonable accommodations.

832. This process is inherently illegal in that it breaks down the interactive process at the 'app stage' and such a breakdown is traceable to the employer.

833. This class is sufficient under Federal Rule of Civil Procedure Rule 23 as it is numerous, certainly over 40 employees and, potentially, in excess of 10,000 employees.

834. With respect to the First Sub-Class, there are common questions of fact and law, particularly whether Defendant's A-to-Z App conforms with the duty to engage the interactive process and the duty to provide reasonable accommodations when there is an absence of a significant financial burden, and whether the app causes significant and unjustifiable delay in the processing of accommodation requests.

835. The Second Sub-Class is also appropriate as a class, as there are common questions of fact and law, particularly whether the RTO policy is inherently discriminatory against employees who require a reasonable accommodation to perform work remotely.

836. The Third Sub-Class is also an appropriate class as there are common questions of fact and law as to whether Defendant's policy of placing individuals, particularly those who work in warehouses, on a short term disability leave, rather than accommodate them, is discriminatory.

THIRD AMENDED COMPLAINT - 88
2:25-cv-00050-JHC

837. The claims or defenses of the representative parties are typical of the claims or defenses of the class.

838. Plaintiffs hereby reserve the right to amend or modify the class definitions pursuant to Fed. R. of Civ. Pro. 15 as necessary.

839. <u>Numerosity</u>. The Members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiffs at this time, based on information and belief, the Class consists of thousands of persons, or more, who have requested reasonable accommodations and who have not been given appropriate attention. Other such claims have been filed, evidencing that this practice is widespread and ongoing for many years, *see e.g. Bishop v. Amazon.com Inc.*, No. 3:22-cv-508, (N.D.T.X. 2023).

840. <u>Commonality</u>. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. At its core, the Class has a common question of law about whether the A-to-Z App can lead to conversations that can satisfy the employer's requirement to engage in the interactive process. As well, the Class has a common question of law about whether the RTO policy is discriminatory on its face and as it is applied. Finally, the Class has a common question of law about whether the LOA policy is discriminatory in practice.

841. <u>Typicality</u>. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs were denied reasonable accommodations because of failure to appropriately handle medical information in the A-to-Z App, based on the RTO policy, and by forced LOA.

842. <u>Adequacy of Representation</u>. Plaintiffs will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiffs' Counsel are competent and experienced in litigating Class actions.

843. <u>Predominance</u>. Defendant has engaged in a common course of conduct toward Plaintiffs and Class Members, in that all the Plaintiffs and Class Members must seek reasonable accommodations through the same process, the A-to-Z App, which is an utter failure and rife with discriminatory animus. The common issues arising from Defendant's conduct affecting

HARMAN GREEN
824 Exposition Ave., Suite 8
Dallas, Texas 75226

Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

844. <u>Superiority</u>. A Class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

845. This case is maintainable as a class action under Fed. R. Civ. P. 23(b)(3). This case is also maintainable as a class action under Fed. R. Civ. P. 23(b)(2). Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

846. Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses through their employment and their use of the A-to-Z App.

## VI.  CAUSES OF ACTION
### FIRST CLAIM

**Disability Discrimination, in violation of the Americans with Disabilities Act and the Washington Law Against Discrimination**

847. Plaintiffs, on behalf of themselves, and, except for Plaintiffs Cook and Ottenweller, on behalf of all Class Members, hereby reallege and incorporate each and every allegation contained in paragraphs 1 through 844 with the same force as though separately alleged herein.

HARMAN GREEN
824 Exposition Ave., Suite 8
Dallas, Texas 75226

848. The Americans with Disabilities Act prevents discrimination in the workplace against persons with disabilities.

849. The Washington Law Against Discrimination (WLAD) prohibits unfair practices by employers such as discriminating against employees with disabilities, and generally provides stronger protections for employees than standards set out under the Americans with Disabilities Act.

850. The Americans with Disabilities Act prevents both overt discrimination, such as harassing statements, but also disparate impact, discrimination that occurs despite intent.

851. The Americans with Disabilities Act requires that employers such as Defendant engage in the interactive process if an employee indicates that they are disabled.

852. Failing to engage in the interactive process is discrimination, whether intentional or not.

853. Simply turning a blind eye to disabled employees seeking reasonable accommodations is illegal as a form of disability discrimination.

854. As well, creating a system that is designed to fail, or inherently fails, such as Defendant's A-to-Z App, has a disparate impact on disabled employees.

855. Plaintiffs are disabled.

856. Plaintiffs made known to Defendant that they were disabled.

857. Defendant did nothing because it forced Plaintiff to rely on the A-to-Z App, which is Defendant's policy when an employee seeks a reasonable accommodation, and that App cannot be used reliably.

858. Specifically, Defendant mandated that Plaintiff (and all Class Members) utilize a faulty app to compile all disability reasonable accommodation requests.

859. The A-to-Z App is a graveyard of unheard reasonable accommodation requests.

860. Rather than take a localized approach where Human Resources representatives and managers work together to accommodate an employee, Defendant relies on the A-to-Z App, where employees are not given personalized attention, and where employees are constantly

THIRD AMENDED COMPLAINT - 91
2:25-cv-00050-JHC

reassigned to new case managers without explanation.

861.	Plaintiffs repeatedly made known, both formally and informally, that they were disabled, and Defendant did not engage in a good faith interactive process to understand what, if any, reasonable accommodation Plaintiffs needed.

862.	Plaintiffs were forced into a cycle of never being able to actually communicate with any person about their disability reasonable accommodation needs in a meaningful way.

863.	Plaintiffs challenge, on behalf of themselves and all Class Members, a company-wide practice and policy, of relying on the A-to-Z App that affects all employees who seek some form of a disability reasonable accommodation.

864.	Whether intentionally or unintentionally, Defendant's A-to-Z App was designed to fail; employees simply cannot seek reasonable accommodations in a timely or reliable manner, often leading to exacerbation of disabilities, injuries at the workplace, or termination of employment.

865.	Plaintiffs' claims are one and the same as the Class Members in the First Sub-Class.

866.	As well, Plaintiffs and Class Members in the Second Sub-Class allege disability discrimination arising out of the RTO policy.

867.	The RTO policy, by design, is inherently discriminatory in that it provides for a corporatewide, non-regionalized policy that denies use of a particular reasonable accommodation.

868.	The RTO policy is no different than a 'no wheelchairs in the office' policy.

869.	As well, Defendant has specifically instructed employees not to engage in the interactive process with employees seeking remote accommodations.

870.	The Plaintiffs and Class Members in the Third Sub-Class allege disability discrimination by way of a corporatewide, non-regional policy of pushing employees, in particular warehouse workers, into a forced leave, often relying on Defendant's Short-Term Disability leave program, rather than accommodate them.

HARMAN GREEN
824 Exposition Ave., Suite 8
Dallas, Texas 75226

871. All three Sub-Classes, and all Plaintiffs and Class Members, have claims stemming from the disability discrimination, and can show that Defendant maintains policies and practices that discriminate through disparate impact.

872. As such, Defendant intentionally and willfully violated Plaintiffs and the Class Member's rights to engage in the interactive process, and owes Plaintiffs and all Class Members all front pay, back pay, emotional distress damages, punitive damages as the failure to engage in the interactive process was malicious and inexcusable, attorney fees, costs, expenses, and any and all other remedies this Court deems just and proper.

873. As such, Defendant intentionally and willfully discriminated against Plaintiffs and the Class Member's based on their status as disabled, and owes Plaintiffs and all Class Members all front pay, back pay, emotional distress damages, punitive damages as the discrimination was malicious and inexcusable, attorney fees, costs, expenses, and any and all other remedies this Court deems just and proper

874. In any event, should the Court find that it cannot award monetary damages to each and every Class Member, Plaintiff seeks for the Class Members, at a minimum, that the Class Members be awarded a declaratory judgment stating the Defendant have violated the Americans with Disabilities Act by allowing disability discrimination as described above.

## SECOND CLAIM

**Failure to provide reasonable accommodations as required by the Americans with Disabilities Act and the Washington Law Against Discrimination**

875. Plaintiffs, on behalf of themselves, and, except for Plaintiffs Cook and Ottenweller, on behalf of all Class Members, hereby reallege and incorporate each and every allegation contained in paragraphs 1 through 872 with the same force as though separately alleged herein.

876. The Americans with Disabilities Act requires that employers such as Defendant provide a reasonable accommodation to an employee if an employee indicates that they are disabled and require such a reasonable accommodation.

HARMAN GREEN
824 Exposition Ave., Suite 8
Dallas, Texas 75226

877. The Washington Law Against Discrimination (WLAD) prohibits unfair practices by employers such as discriminating against employees with disabilities, and generally provides stronger protections for employees than the standards set out under the Americans with Disabilities Act.

878. Plaintiffs are disabled.

879. Plaintiff made known to Defendant that they are disabled.

880. Despite knowing of Plaintiffs' disabilities, and despite knowing that Plaintiffs required a reasonable accommodation, Defendant failed to provide any reasonable accommodation.

881. Despite this, Defendant did absolutely nothing to ascertain what, if any, reasonable accommodation Plaintiff needed.

882. Plaintiffs in the First Sub-Class were not accommodated because Defendant underfunded and under resourced the A-to-Z App such that it prevented employees with disabilities from obtaining a reasonable accommodation when one was available.

883. Plaintiffs in the Second Sub-Class sought a reasonable accommodation in the form of remote work.

884. Defendant simply does not allow for this type of accommodation and did not perform any analysis as to whether any employee could be accommodated with remote work.

885. Plaintiffs' doctors provided notes explicitly stating that they should be accommodated. Plaintiff Corriere's provider explicitly stated that he should be working remotely and not denied the opportunity to work, as that would exacerbate the disabilities.

886. Defendant simply ignored these doctors' notes and placed Plaintiff Corriere on a leave to keep them 'out of sight, out of mind.'

887. Plaintiffs in the Third Sub-Class were similarly pushed out of the workplace pursuant to the LOA policy rather than be accommodated.

888. The same occurred to Plaintiff Grissom when she sought accommodations and was subject to the LOA policy.

HARMAN GREEN
824 Exposition Ave., Suite 8
Dallas, Texas 75226

889. Defendant failed to have a two-way conversation with Plaintiffs about Plaintiffs' disabilities.

890. Defendant's LOA is not a reasonable accommodation, it is a punishment.

891. Reasonable accommodations are meant to support an employee to fulfill their duties without burdens stemming from their disabilities, not keep them out of the workplace.

892. Preventing an employee from working for many months is not a reasonable accommodation, it is a termination in disguise.[3]

893. Plaintiffs' claims are one in the same as the Class Members.

894. As such, Defendant intentionally and willfully violated Plaintiffs' and the Class Members' rights to a reasonable accommodation, and owes Plaintiffs and the Class Members all front pay, back pay, emotional distress damages, punitive damages, attorney fees, costs, expenses, and any and all other remedies this Court deems just and proper.

895. In any event, should the Court find that it cannot award monetary damages to each and every Class Member, Plaintiffs seek for the Class Members, at a minimum, that the Class Members be awarded a declaratory judgment stating the Defendant have violated the Americans with Disabilities Act and the Washington Law Against Discrimination when Defendant failed to accommodate the Plaintiffs in the manners described above.

## THIRD CLAIM

**Constructive Termination in violation of the Americans with Disabilities Act and the Washington Law Against Discrimination**

896. Plaintiffs, on behalf of themselves, and, except for Plaintiffs Cook and Ottenweller, on behalf of all Class Members, hereby reallege and incorporate each and every

---

[3] *See e.g.*, New York State Division of Human Rights, NYS DIVISION OF HUMAN RIGHTS ALLEGES PREGNANCY AND DISABILITY DISCRIMINATION AT AMAZON WORKSITES, https://www.governor.ny.gov/news/governor-hochul-announces-complaint-filed-against-amazon#

THIRD AMENDED COMPLAINT - 95
2:25-cv-00050-JHC

allegation contained in paragraphs 1 through 893 with the same force as though separately alleged herein.

897.    The Americans with Disabilities Act requires that employers such as Defendant provide a reasonable accommodation to an employee if an employee indicates that they are disabled and require such a reasonable accommodation.

898.    The Washington Law Against Discrimination (WLAD) prohibits unfair practices by employers such as discriminating against employees with disabilities, and generally provides stronger protections for employees than the standards set out under the Americans with Disabilities Act.

899.    If an employee requests a reasonable accommodation, and a covered employer does not provide that reasonable accommodation, that employee may be compelled to abandon their employment due to the impact on their safety or negative impact on their emotional state.

900.    Stated differently, employees may be considered 'constructively discharged' if they are not accommodated.

901.    For the claims under the Washington Law Against Discrimination, a plaintiff need only show that the illegal and discriminatory conduct merely influenced the decision to resign or abandon employment.

902.    Plaintiffs and Class Members who have been constructively terminated due to the failure to accommodate them allege that corporatewide, non-regional policies ended their employment to no fault of their own.

903.    The First Sub-Class alleges that Class Members were constructively terminated because the corporatewide policy to rely on the A-to-Z App prevented reasonable accommodations in a timely manner leading directly to Class Members' terminations.

904.    The Second Sub-Class alleges that Class Members were constructive terminated because the RTO policy is a corporatewide policy without any flexibility for a reasonable

THIRD AMENDED COMPLAINT - 96
2:25-cv-00050-JHC

accommodation to work remotely.

905. For the Second Sub-Class, Defendant explicitly demands that human resources employees not engage in the interactive process with employees who seek a reasonable accommodation in the form of remote work.

906. The Third Sub-Class alleges that Class Members were constructively terminated because the corporatewide policy simply pushes employees onto disability leaves that they do not intend to take, and prohibits employees from continuing meaningful employment.

907. Plaintiffs and all Class Members who were constructively terminated or actually terminated are owed all front pay, back pay, emotional distress damages, punitive damages, attorney fees, costs, expenses, and any and all other remedies this Court deems just and proper.

908. In any event, should the Court find that it cannot award monetary damages to each and every Class Member, Plaintiff seeks for the Class Members, at a minimum, that the Class Members be awarded a declaratory judgment stating the Defendant have violated the Americans with Disabilities Act and the Washington Law Against Discrimination by allowing disability discrimination via disparate impact which caused their terminations.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A. For an Order certifying this action as a class action and appointing Plaintiffs (except for Plaintiffs Cook and Ottenweller) and their counsel to represent the Class;

B. For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the First Sub-Class and the failure to engage the interactive process to determine what, if any, reasonable accommodation an employee may need. Relief sought may be ascertained by the closure or significant modification of the A-to-Z App, this will then require Amazon to take a more localized approach to reasonable accommodation requests, which will benefit disabled employees;

THIRD AMENDED COMPLAINT - 97
2:25-cv-00050-JHC

C. For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the Second Sub-Class and the RTO corporatewide policy that prohibits employees from remote employment. Relief sought may be ascertained by denial of an inflexible RTO policy that does not accommodate employees seeking remote employment;

D. For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the Third Sub-Class and forcing Class Members to take forced leaves of absence rather than continue their employment with reasonable accommodations. Relief may be ascertained by creating a more localized reasonable accommodation system that allows for reasonable accommodations to be granted in a timely fashion;

E. For declaratory relief as requested;

F. For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

G. For an award of punitive damages, as allowable by law;

H. For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

I. Pre- and post-judgment interest on any amounts awarded; and

J. Such other and further relief as this Court may deem just and proper.

DATED this 4th day of June 2026.

**FRANK FREED SUBIT & THOMAS LLP**

By: */s/ Michael Subit*
Michael C. Subit, WSBA #29189
705 Second Avenue, Suite 1200
Seattle, WA 98104
Telephone: 206.682.6711
msubit@frankfreed.com

*Local Counsel for Plaintiff*

**HARMAN GREEN**

By: */s/ Evan Richardson*

THIRD AMENDED COMPLAINT - 98
2:25-cv-00050-JHC

Walker G. Harman, Jr.*
Evan K. Richardson*
824 Exposition Ave., Suite 8
Dallas, Texas 75226
NY Bar 6009112
TX Bar 24138559
erichardson@theharmanfirm.com
wharman@theharmanfirm.com

*Attorneys for Plaintiffs*

*\*pro hac vice applications granted.*